Robert B. ALEXANDER, et al.,

v.

NATIONAL FARMERS
ORGANIZATION,
Appellant,

v.

ASSOCIATED MILK PRODUCERS, INC.,
Mid-America Dairymen, Associated Re-
serve Standby Pool Cooperative, Appel-
lees.

Wesley Johnson, Gary Hanman, Harold
S. Nelson and David Parr, Central Milk
Producers Cooperative, Appellee.

Robert B. ALEXANDER, et al.,

v.

NATIONAL FARMERS
ORGANIZATION,
Appellee,

v.

ASSOCIATED MILK PRODUCERS,
INC., Appellant.

Mid-America Dairymen; Associated Re-
serve Standby Pool Cooperative; Wes-
ley Johnson; Gary Hanman; Harold S.
Nelson; David Parr; Central Milk Pro-
ducers Cooperative.

Robert B. ALEXANDER, et al.,

v.

NATIONAL FARMERS
ORGANIZATION,
Appellee,

v.

ASSOCIATED MILK PRODUCERS,
INC., Mid-America Dairymen,
Inc., Appellant.

Associated Reserve Standby Pool Cooper-
ative; Wesley Johnson; Gary Hanman;
Harold S. Nelson; David Parr; Central
Milk Producers Cooperative.

Nos. 81–1235 to 81–1237.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1981.

Decided Aug. 31, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 10, 1982.

See also, 8th Cir., 696 F.2d 1210.

1178

David A. Donohoe, Paul B. Hewitt, Robert G. Berger, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., for appellant Nat. Farmers Organization; Richard A. Green, Marvin Beshore, Washington, D. C., of counsel.

Donald M. Barnes, Michael M. Eaton, Dennis C. Cuneo, Washington, D. C., Colvin A. Peterson, Jr., Kansas City, Mo., for appellee Associated Milk Producers; Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.

Harry P. Thomson, Jr., George E. Leonard, Russell S. Jones, Jr., Shughart, Thomson & Kilroy, P.C., and John C. Gage, Gage & Tucker, Kansas City, Mo., for Mid-America Dairymen, Inc.

Sydney Berde, Richard .M. Hagstrom, Sydney Berde, P.A., St. Paul, Minn., for appellee Central Milk Producers Co-op.

William A. Carey, St. John Barrett, Mary Cheryl Matheis, Barnett, Alagia & Carey, Washington, D. C., for appellee Associated Reserve Standby Pool Co-op., Inc.

Before HEANEY and McMILLIAN, Circuit Judges, and BENSON,[*] Chief Judge.

HEANEY, Circuit Judge.

This case involves reciprocal antitrust actions arising out of the often fierce competition in the Midwest milk industry during the late 1960s and early 1970s. The actions were tried in three phases, generating an extensive record more than 15,000 pages in length. *See In Re Midwest Milk Monopolization Litigation*, 510 F.Supp. 381 (W.D. Mo.1981) (hereinafter *Midwest Milk*). The district court[1] found that none of the parties presented sufficient evidence to meet their respective burdens of proof and, therefore, denied relief on all substantive claims.

We affirm the district court's conclusion that the National Farmer's Organization (NFO) has not violated the antitrust laws. NFO's dairy organizing and marketing efforts fall within the Capper-Volstead exemption which permits farmers to band together for the purpose of collectively marketing their products.

With respect to NFO's claims against Mid-America Dairymen, Inc. (Mid-Am), Associated Milk Producers, Inc. (AMPI), Central Milk Producers Cooperative (CMPC) and Associated Reserve Standby Pool Cooperative (ARSPC), we affirm in part and reverse in part. Mid-Am, AMPI and CMPC did conspire to monopolize milk and eliminate competition through the use of predatory, anticompetitive and unlawful tactics. Such conduct falls outside the Capper-Volstead exemption and violates Sections 1 and 2 of the Sherman Act. The contrary conclusion below is reversed and the case is remanded for a determination of the amount of damages NFO may recover. We affirm the dismissal of NFO's claim against ARSPC because the evidence does not establish that this entity participated in the unlawful conspiracy.

I.

*Factual Background and Governing Law.*

The structure of supply and pricing in the Midwest milk industry may be summarized as follows. Minnesota, Wisconsin and part of Southwest Missouri are the principal ar-

---

[*] The Honorable Paul Benson, Chief Judge, of the United States District Court for the District of North Dakota, sitting by designation.

1. The Honorable John W. Oliver, Senior Judge, United States District Court for the Western District of Missouri.

eas of surplus production, accounting for approximately twenty-five percent of the nation's total milk production. These areas supply milk to the midwest region and to regional markets in the south, southwest and southeast. Milk production is highest in the spring and early summer, while demand for fluid milk products is usually highest in the fall. Thus, some reserve capacity is generally necessary to balance fluctuations between supply and demand.

Grade A milk is that milk which is approved for sale as fluid milk for human consumption (Class I products) and is produced under stricter sanitary conditions than Grade B milk, which may be used only for manufactured products such as cheese and butter (Class II products). Thus, only Grade A may be used for Class I products, while both Grades A and B may be used for Class II products. The USDA regulates the minimum price paid for Grade A milk, which is based upon a "blend price" formula that accounts for the proportion of such milk allocated to Class I and Class II uses in any given market order.[2] Class I uses command a higher price to compensate producers for the added cost of producing milk for such uses and to ensure an adequate supply of wholesome fluid milk. The Class I price is not the same in each regulated local market, however. The minimum price for such milk generally increases from north to south, in part to reflect the transportation cost of shipping from the surplus areas of Minnesota and Wisconsin to the more distant markets.

Individual dairy farmers have too little market power to affect the price paid for their milk. *Midwest Milk, supra,* 510 F.Supp. at 443. By representing numerous farmers, however, dairy cooperatives may achieve higher prices for their members (called a "premium" when it exceeds the

minimum federal order price) and this, of course, is a major purpose of such co-ops. It is the competition between the NFO and certain of the large midwest co-ops which forms the basis of this action.

NFO was formed in 1955 as a nonprofit corporation to engage in protest, lobbying and organizing activities on behalf of farmers. Since 1957, it has also engaged in collective bargaining on behalf of farmers, the principal aim of which is to improve farm income by raising the commodity prices paid to farmers. In the 1960s, NFO pursued a series of programs aimed specifically at the dairy industry—including efforts to establish a common marketing agency, to bargain collectively with established dairy co-ops and, finally, to directly market dairy products. These programs generally were not supported by the large, established dairy cooperatives. Particularly from 1969 onward (when NFO commenced its direct marketing efforts), NFO and the established co-ops became vigorous competitors in the marketing of raw Grade A milk produced in the midwest.

The late 1960s were also marked by a massive consolidation of many midwestern co-ops into a few, larger cooperatives. Mid-Am was formed in 1968, ultimately combining what earlier had been more than sixty independent co-ops and dairies from across the midwest.[3] AMPI was formed in 1969 and is comprised of more than seventy such entities. CMPC is a federation of co-ops, including AMPI, which supplies milk solely to the Chicago market. ARSPC is also a cooperative federation, including Mid-Am and AMPI as members, engaged in standby pooling operations with its members and with certain proprietary dairies.

The pattern of consolidation and use of certain marketing practices led the Justice

---

**2.** A federal market order is a geographic area defined as a market by the USDA and is subject to minimum price and other regulation under a market administrator. The greater Chicago area, for example, is Federal Market Order 30 (Order 30).

**3.** The merged co-ops include Square Deal Milk Producers of Highland, Illinois; Mid-America

Dairymen of Kansas City, Missouri; Twin Cities Milk Producers of St. Paul, Minnesota; Producers Creamery of Springfield, Missouri; Sanitary Milk Producers of St. Louis, Missouri; and Producers Creamery of Chillicothe, Missouri. *See Midwest Milk, supra,* 510 F.Supp. at 443–448.

Department to sue both Mid-Am and AMPI for antitrust violations, matters which were settled by consent decrees.[4] They are not significant here except insofar as such decrees may affect any claim by NFO for injunctive relief.[5]

The present case is a private antitrust action. It began in 1971 when Mid-Am filed several claims against NFO, of which essentially two remain on appeal: that NFO violated Section 1 of the Sherman Act and Section 4 of the Clayton Act by (1) engaging in illegal price-fixing with respect to marketing of milk, and (2) promoting a group boycott of Mid-Am by enlisting Mid-Am members to breach their contracts and refuse to deal with Mid-Am. NFO counterclaimed against Mid-Am, AMPI, CMPC and ARSPC, alleging unlawful monopolization, attempted monopolization and conspiracy to monopolize milk marketing and to unlawfully eliminate NFO as a competitor. AMPI then counterclaimed against NFO, alleging essentially the same price-fixing claims asserted by Mid-Am and alleging violations of the Agricultural Fair Practices Act as well as an illegal conspiracy to "destroy" AMPI and to monopolize milk.

The allegations of the parties include assertions of actual and attempted monopolization under Section 2 of the Sherman Act, conspiracies to monopolize under Section 2, conspiracies to eliminate competition through unlawful means under Sections 1 and 2 and certain *per se* violations under Section 1. The parties are not often clear on which factual allegations are linked to which of their legal theories, and the nature

of legal liability is further complicated by the Capper-Volstead Act, 7 U.S.C. § 291, which immunizes certain activities of farm cooperatives. Before turning to the specific claims of each party, a summary of the applicable law will be helpful.

■ A Section 2 claim of actual monopolization generally requires, *inter alia*, a showing of monopoly power in the relevant product and geographic market. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). An attempt to monopolize claim generally requires the specific intent to monopolize and a showing of a "dangerous probability" of success, the latter of which is also examined by reference to the offender's share of the relevant market. *See, e.g., Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *AgraShell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 285–287 (8th Cir.), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973).[6] The "relevant market" element is important because monopolization and attempt cases often stand or fall on the definition of the product and geographic market. *See, e.g., Von Kalinowski, Antitrust Laws and Trade Regulation*, §§ 8.02[3]c, 9.01[3] (1982) (collecting cases) (hereinafter, *Von Kalinowski*).

■ A Section 2 claim for conspiracy to monopolize, however, generally does not require proof of a relevant market, at least not in the manner required in actual and attempted monopolization cases. *Cf. Unit-*

---

4. *See United States v. AMPI*, 394 F.Supp. 29 (W.D.Mo.1975); *United States v. Mid-Am, Inc.*, 1977-1 Trade Cases ¶ 61,508 (1977). Both the public and private antitrust actions were conducted before the Honorable John W. Oliver, Senior Judge, United States District Court for the Western District of Missouri.

5. Part of NFO's claim is based, for example, upon allegedly predatory acquisitions by AMPI. Under the consent decree, AMPI is enjoined from making certain acquisitions without Justice Department approval. *See United States v. AMPI*, note 4, *supra*, 394 F.Supp. at 54. Moreover, in approving the consent decree, the court determined that divestiture of AMPI's acquisitions was not necessary in the public

interest. *Id.* Although some conduct enjoined under the consent decree is similar to conduct complained of here, the consent decree evidences neither admission, denial nor any ultimate conclusion as to any facts at issue here.

6. *But see Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488, 504 (9th Cir. 1977), holding that "relevant market" is not at issue in an attempted monopolization case and that a plaintiff must show only that an "appreciable amount of commerce" is involved. The Ninth Circuit's view of attempted monopolization has not been followed in this Circuit. *See Agra-Shell, Inc. v. Hammons Prods., supra*, 479 F.2d 269, 287 (8th Cir.) *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973).

ed States v. DuPont de Nemours & Co., 351 U.S. 377, 395 n.23, 76 S.Ct. 994, 1007 n.23, 100 L.Ed. 1264 (1956). This is because the essential elements of a Section 2 conspiracy claim are concerted action and specific intent to monopolize, such that it need only be further shown that the conspiracy affected "some appreciable part of interstate commerce." United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1971). Some commentators have argued, however, that relevant market should be considered a necessary element of Section 2 conspiracy claims, at least in civil cases. See, e.g., 3 Von Kalinowski, supra, § 9.02[4]. In our view, a civil Section 2 conspiracy claim, standing alone, does require a minimal showing of product and geographic context—upon what and where the alleged conspiracy is focused—to ensure that a claim is not based upon some abstract showing of unlawful intent. The nature of such proof, however, is simply to show the context of the conspiracy. It need not be as rigorous as the relevant market showing for other Section 2 claims, because actual attainment or "dangerous probability" of monopoly power is not at issue in a conspiracy claim.

■ These general antitrust principles must be construed in light of the immunity afforded farm cooperatives under the Capper-Volstead Act, 7 U.S.C. § 291. Such entities are exempt from liability for price-fixing and other joint marketing efforts which seek to achieve the lawful aims of the cooperative movement, i.e., collective marketing of farm products so as to improve economic conditions for individual farmers. See, e.g., Maryland & Virginia Milk Producers Assoc. v. United States, 362 U.S. 458, 466, 80 S.Ct. 847, 853, 4 L.Ed.2d 880 (1960). Cooperatives may combine with each other to do together what they may lawfully do individually and, hence, they cannot be conspirators to the extent their concerted action is in pursuit of legitimate aims. See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962) (Sunkist I). Similarly, cooperatives may, singly or in combination with other exempt cooperatives, obtain monopoly power in a given market so long as it is achieved through natural growth, voluntary confederation and without resort to predatory or anti-competitive practices. E.g., Fairdale Farms v. Yankee Milk, Inc., 635 F.2d 1037, 1044 (2d Cir. 1980).

■ Capper-Volstead provides only limited immunity and co-ops have occasionally sought to extend their market power in ways not intended by Congress. Co-ops cannot, for example, conspire or combine with nonexempt entities to fix prices or control supply, even though such activities are lawful when engaged in by co-ops alone. See United States v. Borden, 308 U.S. 188, 207–208, 60 S.Ct. 182, 192, 84 L.Ed. 181 (1939).

Similarly, the Capper-Volstead Act "did not leave cooperatives free to * * * restrain and suppress competition with the cooperatives." Maryland & Virginia Milk Producers Assoc., supra, 362 U.S. at 467, 80 S.Ct. at 853. The scope of prohibited practices has been increasingly clarified through case law.

■ There is no immunity, for example, for attempts to restrain competition through discriminatory pricing, Knuth v. Erie-Crawford Dairy Cooperative Assoc., 395 F.2d 420, 424 (2d Cir. 1968); coercion of persons to join the cooperative, Gulf Coast Shrimpers & Oystermans Assoc. v. United States, 236 F.2d 658, 665 (5th Cir. 1956); predatory harassment, Otto Milk Co. v. United Dairy Farmers Cooperative Assoc., 388 F.2d 789, 797 (3d Cir. 1967); or illegal boycotts, North Texas Producers Assoc. v. Metzger Dairies, Inc., 348 F.2d 189, 196 (5th Cir. 1956). In Maryland & Virginia Milk Producers Assoc., supra, 362 U.S. at 468, 80 S.Ct. at 854, the Supreme Court summarized a number of "anticompetitive activities which are so far outside the 'legitimate objects' of a cooperative that, if proved, they would constitute clear violations of Section 2 of the Sherman Act." Included among such activities were a co-op's attempt to interfere with truck shipments of nonmembers' milk and its use of prior debt to influence a dairy to buy only from the co-op. Id. Moreover, in review-

ing an otherwise lawful dairy acquisition as part of an alleged attempt to eliminate competition, the same Court held that "even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act." *Id.* at 472, 80 S.Ct. at 856.

 Whether a co-op's given business practice is unlawful thus is not merely a question of whether it is "predatory" in a strict sense, *e.g.*, lacking a legitimate business justification. As the Sixth Circuit recently noted, "[a]n anti-competitive practice may have economic justification, but its use may be undertaken with unlawful intent and in the desire to achieve an unlawful goal." *United States v. Dairymen, Inc.*, 660 F.2d 192, 195 (6th Cir. 1981). That Court squarely rejected the argument that Section 2 prohibits co-ops only from engaging in narrowly defined "predatory practices." *Id.* at 194. We agree. A cooperative may not use its position, no matter how lawfully acquired, "to stifle or smother competition." *Maryland & Virginia Milk Producers Assoc., supra,* 362 U.S. at 463, 80 S.Ct. at 851. Where such an unlawful intent is clear, overt acts in furtherance of this purpose are not immunized simply because they might also have other justifications or because they are merely "anti-competitive" rather than "predatory."

 These limited immunity principles must also be harmonized with the ordinary intent element of Section 2. Attempted monopolization and conspiracy to monopolize usually require a showing of specific intent to monopolize, *see supra* at 1179–1180, but as we have noted, a cooperative may form such an intent lawfully. The impermissible aim is to pursue monopoly power by eliminating or restraining competition with the co-op through predatory or anti-competitive practices. An intent to do so is, therefore, the proper intent element of an attempted monopolization or conspiracy claim under Section 2. Of course, a conspiracy or combination to eliminate competition through such unlawful means would also violate Section 1 as an unreasonable restraint of trade. *See Maryland & Virginia Milk Producers Assoc., supra,* 362 U.S. at 463, 80 S.Ct. at 851.

With this background in hand, we turn to the specific claims at issue.

.

## II.

### *Claims Against NFO.*

**A.** *Price-fixing and the Capper-Volstead Exemption.*

Central to the antitrust claims of Mid-Am and AMPI is the contention that a number of NFO programs constituted horizontal price-fixing, a *per se* violation of the Sherman Act unless exempt. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Mid-Am and AMPI further argue that NFO cannot claim the Capper-Volstead exemption, principally because a small number of non-farmers were nominal members of NFO during certain periods at issue here.

The district court did not rule on the Capper-Volstead question because it concluded that NFO's activities did not constitute price-fixing. *Midwest Milk, supra,* 510 F.Supp. at 423–426. We cannot agree with this conclusion. In reviewing the district court's decision, we note that most of the relevant facts are not in dispute. The parties stipulated to 3,206 facts with respect to Mid-Am's Phase I claims against NFO and the district court noted: "[T]he real disputes in regard to Phase I * * * present legal questions and relate, on the facts, to questions of what inferences should be drawn from stipulated and undisputed underlying factual circumstances." *Id.* at 386.

The stipulated facts are that, initially, NFO did not market milk at all, but instead promoted a common marketing agency for co-ops and individual farmers—an organization that could bargain more effectively by collectively representing a larger share of milk producers. NFO later presented "Master Contracts" to cooperatives which, by their terms, would be activated once sixty percent of the milk supply in a particular area was subject to such agreements. One purpose of the Master Contracts was to enable NFO to bargain for the price paid to producers for their milk. These Master Contracts were never activated, however,

because the sixty percent share level was never reached. NFO later began direct marketing of milk, pursuant to "supply contracts" with various processors. Under these agreements, the processor would pay a flat formula price for all "NFO milk" which, in turn, would be paid to the individual producers of such milk.[7]

The foregoing practices are the principal basis of the price-fixing allegations made by both Mid-Am and AMPI. It is arguable whether NFO's efforts to promote a common marketing agency could constitute actionable price-fixing. Such an entity, if ever formed, presumably could have been structured to comply with the Capper-Volstead exemption for cooperatives. The price-fixing dimension of the NFO Master Contract program is also somewhat unclear because such contracts were never activated and their operation in practice, therefore, cannot be fully ascertained. The NFO Supply Contracts, however, involved direct milk marketing by NFO. Individual farmers signed supplemental agreements under which NFO would represent them for purposes of selling milk. Buyers of NFO milk entered into supply contracts that provided a *fixed formula price* to be paid to the NFO National Trust which, in turn, was paid on a patronage basis to the individual producers of such milk. This arrangement plainly reflects a horizontal combination of producers agreeing to have NFO fix the prices at which their product will be sold. Unless exempt from the antitrust laws, horizontal price-fixing is, of course, a *per se* violation of the Sherman Act. *See, e.g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). Because the stipulated facts make out a prima facie case of price-fixing, it was error for the district court to conclude otherwise without reaching the issue of NFO's exemption. NFO is nonetheless not liable for price-fixing, however, because its milk marketing arrangements were exempt under the Capper-Volstead Act.

The Capper-Volstead Act, 7 U.S.C. § 291, was adopted in 1922 to make clear that the antitrust laws would not prohibit farmers from organizing collectively for purposes of marketing their products. The Supreme Court has construed the exemption as permitting "farmer-producers to * * * *fix prices at which their cooperative will sell their produce* * * * without thereby violating the antitrust laws." *Maryland & Virginia Milk Producers Assoc., supra*, 362 U.S. at 466, 80 S.Ct. at 853 (emphasis added). Thus, the milk marketing arrangements of NFO are clearly within the scope of activities contemplated under the Capper-Volstead exemption.

The exemption is an affirmative defense and NFO introduced sufficient evidence to establish prima facie entitlement to the exemption. The stipulated facts show that NFO is a nonprofit, non-stock corporation which gives collective bargaining and marketing services exclusively to its members in connection with their agricultural commodities. The record further shows that in 1970, the Department of Agriculture deemed NFO to be a qualified cooperative marketing association, although the parties disputed that determination when it was made and do so here as well. The challenge to NFO's exemption relates to (1) the corporate structure of its marketing program, and (2) certain non-farmers who appear to have been members of NFO at various periods.

The structural issue arises because NFO's bylaws prohibit distribution of income to its members. As a result, when it began to market milk, NFO created a separate legal entity—essentially a trust custodial account—that received payment for milk sales and, in turn, paid the producers. The Capper-Volstead Act requires that a cooperative be "operated for the mutual benefit of the members thereof, as such producers." 7 U.S.C. § 291. Mid-Am argues that because NFO cannot distribute income, its marketing program cannot be considered to be "for the mutual benefit" of

---

**7.** Because of bylaws restricting NFO's receipt and use of funds, a separate NFO Trust was created which processed dairy sales monies. *See infra*, at 1184–1185.

its members. This precise claim was squarely rejected in *Waters v. NFO, Inc.*, 328 F.Supp. 1229, 1245 (S.D.Ind.1971). We also find no merit in Mid-Am's claim.

Mid-Am concedes that the NFO Trust properly operates for the mutual benefit of producer-members who market through NFO. Mid-Am insists, however, that each entity must be considered entirely independent for Capper-Volstead purposes. Such reasoning is contrary to the facts and would defeat the purpose of the Capper-Volstead exemption. NFO members who sold milk were in fact paid on a patronage basis for their products and buyers of such milk who paid the NFO National Trust knew they were dealing with NFO as essentially one organization. Under less compelling circumstances, the Supreme Court has indicated that organizational distinctions should not be permitted to defeat the clear purposes of the Capper-Volstead exemption. In *Sunkist I, supra,* the Supreme Court was presented with three legally distinct entities formed by a huge group of citrus growers. The three entities were alleged to have illegally conspired with each other, although the actual activity was lawful if engaged in by any one cooperative. The Supreme Court held they must be considered as one organization for Capper-Volstead purposes, noting:

> To hold otherwise would impose grave legal consequences upon organizational distinctions that are of de minimus meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper-Volstead Acts.

*Sunkist I, supra,* 370 U.S. at 29, 82 S.Ct. at 1135.

The *Sunkist I* rationale applies with special force where, as here, it is obvious that NFO's milk marketing, through the mechanism of the Trust Account, was fairly operated for the mutual benefit of all dairy farmers who participated.

The second and primary challenge to NFO's exemption, made by both Mid-Am and AMPI, relates to a small number of persons who appear to have been non-farmer members of NFO for certain periods in the late 1960s and early 1970s. Although this issue is more serious than the structural claim raised by Mid-Am, we again are guided by the overriding purpose of the Capper-Volstead Act which, in our view, supports upholding the exemption claimed by NFO.

The unmistakeable purpose of the Capper-Volstead Act is to permit farmers and only farmers to band together and benefit economically from collective marketing of their products. *See, e.g., Case-Swayne Co., Inc. v. Sunkist Growers, Inc.,* 389 U.S. 384, 391–393, 88 S.Ct. 528, 532–533, 19 L.Ed.2d 621 (1967) (*Sunkist II*). Here, this purpose unarguably has been served by NFO. There is no dispute that only dairy farmers—true producers—marketed milk through NFO. Only such farmers sold milk through NFO and only such farmers were paid for NFO's sale of their milk products. Moreover, NFO complied with the requirement that non-farmers be excluded from membership by adopting bylaws in 1970 which make clear that any member who quits farming "shall automatically cease to be a member, and his or her membership agreement shall become null and void."[8] Such bylaws also restrict membership to those engaged in actual production of agricultural products.

The non-farmer issue arises largely because of ignorance or sloppiness on the part of NFO in policing its membership rolls. The stipulated record includes letters from approximately twenty-five individuals which generally indicate they never were or no longer were farmers, had received membership dues billings from NFO and did not want to pay such dues. Mid-Am and AMPI

---

**8.** The record indicates that prior to 1970, NFO, in apparently two instances, permitted officers or staff members to retain their memberships even though the scope of their NFO duties resulted in their no longer being active farmers. One such officer's Board position was terminated in 1967, prior to Mid-Am or AMPI's formation; the other staff member apparently retained membership status until the 1970 bylaw was adopted.

assert that these letters are conclusive proof that NFO had non-farmer members and thus should be denied the Capper-Volstead exemption. On the unusual facts of this case, we disagree.

The issue is a close one because of language in a 1978 Supreme Court decision which suggests that even one non-farmer member disqualifies a cooperative from claiming the Capper-Volstead exemption. *See National Broiler Marketing Assoc. v. United States*, 436 U.S. 816, 827–829, 98 S.Ct. 2122, 2129–2130, 56 L.Ed.2d 728 (1978). Although it was clear prior to *National Broiler* that only farmers were within the scope of the Capper-Volstead exemption, it was not at all clear that careless membership practices would, standing alone, preclude operation of the exemption. The district court read *National Broiler* as imposing a duty to police one's membership to ensure that "not even one" non-farmer is a member. *Midwest Milk, supra*, 510 F.Supp. at 426. On this ground, the district court indicated that if it had reached the exemption question, it would have ruled that NFO was disqualified. The district court further indicated that, except for *National Broiler*, it would be inclined to sustain NFO's exemption because the non-farmer issue was "factually predicated upon mere record-keeping formalities—the mere presence on the membership list of names of individuals who, by express bylaw provision, had been stripped of all vestiges of membership." *Id.* at 425. The district court's discussion of the exemption is, of course, only dicta because the Court expressly did not reach the issue. It is helpful here, however, because it confirms how different the NFO situation is from the non-farmer issue in *National Broiler*.

█ *National Broiler* involved a marketing association of vertically integrated poultry producers. A number of the members were only processors in that they did not own or control breeder flocks, hatcheries or grow-out facilities. *Id.* at 822, 98 S.Ct. at 2127. The United States challenged the exemption because these members were essentially middlemen, not farmers, and the Supreme Court agreed that Congress did not intend to exempt "even one" such mid-

dleman. *Id.* at 826–828, 98 S.Ct. at 2129–2130. The Supreme Court's rationale is consistent with its earlier decision in *Sunkist II, supra,* in which it denied the Capper-Volstead exemption to a citrus growers association because approximately fifteen percent of its members were non-farmer processors. Both cases make clear that no middlemen are to be permitted to "infiltrate" otherwise exempt cooperatives; and that vertical integration in agricultural industries cannot extend to a point where non-farmer middlemen can claim the Capper-Volstead shield. The "not even one" language in *National Broiler* cannot be divorced from that Court's emphasis on the economic role of such middlemen and on the intent of Congress not to permit such middlemen to participate in price-fixing. *National Broiler, supra*, 436 U.S. at 827–829, 98 S.Ct. at 2129–2130.

█ There is no suggestion here that dairy industry processors were members of NFO. On the contrary, the stipulated record shows that the non-farmers who were putative members of NFO included, for example, a car dealer, a truck driver, a fertilizer salesman, a school teacher, a retired farmer, a TV salesman and a telephone company employee. The letters in the record further indicate that many of these non-farmers never considered themselves NFO members. When they received dues' billings, they typically wrote of having made "donations" to "help get things started" and of not wanting to continue doing so.

It appears that NFO may have been overly broad in its solicitation of support, but receipt of twenty-five dollars in "dues" from a handful of individuals is hardly the same as shielding middlemen from price-fixing liability, as in *Sunkist II* and *National Broiler*. Moreover, unlike the cooperatives in those two cases, NFO does not contend that the putative non-farmer members should be permitted to claim any exemption. Indeed, NFO's bylaws prohibit such persons from asserting any membership interest and there is no contention that

such persons bought or sold milk through NFO.

We are not called upon to decide whether *National Broiler* requires a rigid rule for membership practices employed after that case was decided in 1978. The district court's view on such a question may well be proper. The issue here only relates to the late 1960s and early 1970s and is much narrower. Simply put, the question is whether NFO can claim the exemption for its milk marketing activities during the period at issue here, when such activities were conducted exclusively for true dairy farmers, notwithstanding that a small number of non-farmers, unrelated to the dairy industry, apparently paid dues to NFO during that period. We think the answer is "yes" in light of the overriding purpose of the Capper-Volstead Act.

As Justice Brennan noted, concurring in *National Broiler, supra*, 436 U.S. at 830, 98 S.Ct. at 2131, the Capper-Volstead Act was "populist legislation" designed to allow farmers to band together "in order to survive against the economically dominant manufacturing, supplier, and purchasing interests with which they had to interrelate." NFO is the kind of populist farm organization contemplated by the Capper-Volstead Act. Regardless of the wisdom of its programs, NFO's entry into milk marketing exclusively on behalf of dairy farmers is precisely the kind of cooperative endeavor that Congress intended not to be subject to antitrust attack. To hold otherwise would defeat the purpose of the Capper-Volstead Act. Moreover, it would be cruelly ironic to exempt large co-ops like Mid-Am and AMPI—professionally managed and operated by many non-farmers—while denying exemption to the farmers who banded together in NFO. We decline to do so.

Thus, we hold that the milk marketing contracts and programs promoted by NFO during the period at issue in this action do not constitute actionable price-fixing in light of the Capper-Volstead exemption.

B. *Mid-Am's Boycott Claims.*

██ Mid-Am contends that NFO enlisted dairy farmers in a boycott of Mid-Am with the intent to force Mid-Am to sign an NFO milk supply contract. Mid-Am further argues that such a group boycott is a *per se* antitrust violation regardless of whether its promoter is exempt under the Capper-Volstead Act. We agree that the Capper-Volstead exemption does not shield a cooperative from liability for predatory trade practices, including group boycotts. *See supra*, at 1182–1183. Here, however, the district court rejected the crucial factual findings upon which Mid-Am's claim is based. After close analysis of the record, we cannot say the district court's findings are clearly erroneous.

Mid-Am's theory essentially is that virtually all of NFO's milk marketing activity had the sole purpose of eliminating the established cooperatives. It construes NFO's solicitation of producers as an attempt to induce such farmers to breach their agreements with Mid-Am. It argues that NFO's entry into direct marketing was not as a bona fide competitor, but rather was only intended to pressure Mid-Am into signing an NFO Supply Contract. Similarly, it characterizes NFO's sponsorship of milk withholding as coercion of the co-ops, again to pressure them into signing a supply contract. In this context, Mid-Am makes much out of a comment by an NFO official in a meeting with Mid-Am to the effect that "NFO had been a burr under the saddle of the co-ops and would just have to continue to be."

██ We have no doubt that NFO was such a "burr." That alone, of course, does not violate the antitrust laws. More important, Mid-Am's characterization of NFO's activities was squarely rejected by the district court. It is true that many Mid-Am members were the object of NFO's solicitations, but this was inevitable because in some regions, nearly all of the producers had been Mid-Am members. Indeed, prior to NFO's entry into marketing in Missouri, some dairy farmers had no practical alternative to Mid-Am. *Midwest Milk, supra*, 510 F.Supp. at 469. Solicitation of business, however, is not the same as inducing a breach of contract; and Mid-Am failed to prove that NFO's activities rose to the level of the latter. Mid-Am's

position would, on this record, employ the antitrust laws as a barrier to market entry—stifling the very competition which such laws are designed to encourage. We also note that Mid-Am lost and does not appeal its state law claim that NFO allegedly induced dairy farmers to breach their Mid-Am contracts.

▮▮▮ NFO's sponsorship of a two-week milk withholding action was broad in scope and part of concerted demands for higher dairy prices. The court found that no individual farmer's decision to withhold milk was coerced by NFO or otherwise. When not directed at the elimination of competition, this type of activity, as a general matter, is within the scope of the Capper-Volstead exemption. The court found that Mid-Am failed to show that the action was intended to eliminate co-ops and we cannot say this finding was clearly erroneous.

Finally, we cannot agree with Mid-Am that NFO did not intend to be a bona fide competitor in milk marketing. We recognize that NFO's marketing program was fraught with problems, but there is no merit in Mid-Am's suggestion that it was just another "expedient" in attempting to eliminate the established co-ops. As the district court noted:

> [T]he record would come closer to supporting a set of findings that NFO became a victim of its own propaganda and that its ignorance and inexperience in the dairy field required it to experiment with one unsound idea after another.

*Midwest Milk, supra,* 510 F.Supp. at 420.

We affirm the district court's conclusion that Mid-Am failed to carry its burden with respect to its claim that NFO engaged in predatory practices and an illegal boycott.[9]

C. *AMPI's Counterclaim.*

AMPI's claims were tried in Phase III of the proceedings below. Its price-fixing

claim, of course, is resolved by our holding above that NFO's activity was shielded by the Capper-Volstead Act, *see supra,* at 1186–1187. The gravamen of its other charges, as characterized by AMPI, is that NFO and others conspired to gain control of sufficient milk as to control the price of milk nationwide and employed the predatory practice of inducing AMPI members to breach their agreements with AMPI. The alleged conspiracy also was aimed at "destroying" AMPI, presumably as a competitor of NFO.[10] AMPI also contends that NFO violated the Agricultural Fair Practices Act (AFPA), 7 U.S.C. § 2303.

▮▮▮ On this record, there can be no substantive claim of attempted monopolization under Section 2. A necessary element of such a claim is a showing of a "dangerous probability" of success, which no one asserts was ever posed by NFO. Indeed, AMPI characterizes NFO's marketing programs as "grandiose" but "inept and incompetent" and the district court found them "quite unsuccessful." *Midwest Milk, supra,* 510 F.Supp. at 419–420. The only issue then is an alleged conspiracy under Sections 1 and 2, which AMPI asserts operated at two levels.

▮▮▮ One alleged conspiracy was between NFO and certain nonexempt entities. Specifically, the alleged coconspirators were certain milk haulers, bottling plants and others that entered into various contracts with NFO in connection with its direct marketing efforts. The district court expressly found that these were normal business relationships and that such entities did not conspire with NFO in terms of any matters which might involve antitrust concerns. On appeal, AMPI has offered nothing which would show this conclusion to be erroneous.

---

**9.** The district court did not rule on damage issues, but NFO argues on appeal that Mid-Am cannot recover damages because its harm, if any, resulted from NFO's pro-competitive entry into marketing. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Although there is support in the record for this theory, we need not reach the issue in light of our holding.

**10.** AMPI and Mid-Am contend that NFO was not a true competitor, which is probably why AMPI casts its claim simply as a conspiracy to "destroy" AMPI. We treat the claim as an alleged conspiracy to eliminate competition cognizable under the Sherman Act.

The other alleged conspiracy was internal, involving various officers and employees of NFO. AMPI contends that these individuals conspired to eliminate AMPI as a competitor and employed predatory practices toward this goal. The district court did not reach the question of whether NFO is legally capable of conspiracy in this manner, and there are unsettled questions in the law of so-called intra-corporate conspiracies. *Cf. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969); *Shoenberg Farms, Inc. v. Denver Milk Producers, Inc.*, 231 F.Supp. 266 (D.Colo.1964); 3 *Von Kalinowski, supra*, § 7.02[1]. We need not reach this legal issue, however, because AMPI's claims fail as a factual matter.

AMPI concedes that NFO's attempt to achieve a common marketing agency, prior to its direct marketing efforts, was pursued by seeking to have the *existing* cooperatives join together. The record further shows that until 1969, NFO supported the concept of voluntarily merging co-ops to form stronger bargaining units. Thus, these efforts hardly reflect an intent to destroy the co-ops, as AMPI argues.

██ AMPI's more serious contention is that NFO employed unlawful, predatory practices once it commenced direct marketing—specifically, coercing farmers to leave AMPI, join NFO, or retain their membership in NFO and unlawfully inducing AMPI members to breach their marketing contracts. The coercion claim is also alleged as a violation of the AFPA, 7 U.S.C. § 2303. The district court, however, expressly found that NFO coerced no farmers, either its members or AMPI members, and nothing in the record would make this finding erroneous. *See Midwest Milk, supra*, 510 F.Supp. at 526–527.

The inducement of breach contention is closely related to AMPI's claim that NFO used fraudulent misrepresentations to induce AMPI members to "switch" to NFO, thereby violating the AFPA. These issues have been extensively litigated in a Wisconsin state court action initiated by AMPI, upon which NFO and AMPI now make assertions of collateral estoppel and res judicata.

There is no doubt that by 1971, NFO and AMPI were in full-scale competition for milk producers. NFO solicited dairy farmers, including AMPI members, to ship through NFO's direct marketing program. AMPI brought suit in Wisconsin state court to stop NFO's activity, commencing litigation which has twice reached the Wisconsin Supreme Court and recently an intermediate appellate court as well. The Wisconsin trial court has adopted AMPI's view and enjoined NFO three times and on all three occasions, it has been reversed and had its orders vacated.

In *Pure Milk Products Cooperative v. NFO*, 64 Wis.2d 241, 219 N.W.2d 564 (1974) (*Pure Milk I*)[11] the Wisconsin Supreme Court reversed a temporary injunction which had been entered against NFO. It found the injunction overly broad, indicating that legitimate competition would allow inducement of AMPI members to terminate their marketing agreements in accordance with the terms of such contracts. *Id.* at 572, 575. It also found the record inadequate with respect to any claim of fraudulent misrepresentations. *Id.* On remand, the trial court found that approximately 1,200 AMPI members had been induced by NFO to "switch" milk shipments to NFO and that such actions breached their marketing agreements with AMPI. It further found that NFO had made fraudulent misrepresentations in the course of soliciting AMPI members.

On appeal, in *Pure Milk Products Cooperative v. NFO*, 90 Wis.2d 781, 280 N.W.2d 691 (1979) (*Pure Milk II*), the Wisconsin Supreme Court again reversed. The court emphasized AMPI's practice of permitting its members to ship to plants of their choice without thereby breaching their AMPI contracts.[12] *Id.*, 280 N.W.2d at 696–698. On

---

11. The captioned plaintiff is a predecessor of AMPI, and the litigation was later carried forward by AMPI. We continue the *Pure Milk* designation to avoid confusion.

12. The key apparently was that AMPI be permitted to nonetheless receive fees for testing its members' milk. Although there were disputes over NFO paying such fees to AMPI, the record

this basis, the Supreme Court squarely held that the mere "switching" of shipments to NFO, and NFO's solicitation of such shipments, were not a breach of any contract. *Id.* at 697, 698. The Court also reversed the finding of fraudulent misrepresentations, directing that on remand such questions be considered only in the context of the approximately 160 AMPI members who had terminated their marketing agreement altogether.[13] *Id.* at 701.

On remand, the trial court reissued a broad injunction based on findings which were contrary to the Supreme Court's mandate in *Pure Milk II.* This third order was recently reversed by an intermediate appellate court in an opinion which makes clear that the issue of fraudulent representations is still open upon appellate review. *Pure Milk Products Cooperative v. NFO,* 105 Wis.2d 758, 317 N.W.2d 510 (1981) (*Pure Milk III*).

 AMPI argues that because of the third decision of the Wisconsin trial court, collateral estoppel bars NFO from contesting whether it made fraudulent misrepresentations. This is plainly wrong. That trial court's findings have been reversed three times and, in the last instance, its misrepresentation findings were expressly reserved for further review. Such determinations thus lack the finality required for collateral estoppel.

 NFO, on the other hand, argues that res judicata bars AMPI's assertion of both its inducement of breach and misrepresentation claims. This too misses the mark. Res judicata involves claim preclusion, not issue preclusion. Here, AMPI's claim under the AFPA is a different cause of action from its state law claim. Thus, AMPI's assertion that NFO made "knowing misrepresentations" in violation of the AFPA is properly raised in the present action and must rest, not on collateral estoppel, but on the facts adduced below.

 It appears, however, that collateral estoppel would bar AMPI's assertion that NFO's solicitation of AMPI members constituted an inducement to breach their contracts. All of the elements of the collateral estoppel doctrine are present. The parties in the Wisconsin action are identical to the parties here. The issue—whether NFO's solicitations induced a breach of contract by AMPI members—is identical to the issue here, although it is now cast as part of a predatory practice claim. The parties had a full and fair opportunity to litigate the issue, and the Wisconsin Supreme Court reached a final judgment. Its resolution of the issue was necessary to its judgment and was expressly reached. Collateral estoppel, therefore, seems applicable. *See Montana v. United States,* 440 U.S. 147, 153–154, 99 S.Ct. 970, 973–974, 59 L.Ed.2d 210 (1979); *Oldham v. Pritchett,* 599 F.2d 274 (8th Cir. 1979). Indeed, AMPI argued vigorously in its brief that judicial economy and federalism principles weigh heavily in favor of precluding relitigation of issues settled in the Wisconsin litigation.

 The district court, however, rejected AMPI's inducement of breach claims as a factual matter on the merits. Much of the evidence adduced below consisted of the evidence adduced in the Wisconsin litigation, where AMPI also lost its contention that "switching" members constituted a contract breach. After reviewing the record, we cannot find the district court's conclusion clearly erroneous.

 The only remaining claim against NFO is that it made knowing misrepresentations in violation of the AFPA, 7 U.S.C. § 2303(c), (e) & (f). Whether a "knowing" violation requires intentional conduct or mere negligence is not clear under the Act and has not been addressed by any court. We find it unnecessary to reach this issue, however. The district court found both that there was insufficient evidence that

shows that AMPI generally did not view such disputes as involving breach of a member's contract. *See Pure Milk Products Cooperative v. NFO,* 90 Wis.2d 781, 280 N.W.2d 691, 697–698 (1979) (*Pure Milk II*).

**13.** The trial court presumably was to consider whether such terminations were fraudulently induced and was allowed to reopen fact finding on the scope and scale of such matters.

false representations about AMPI were made and that, in any event, there were no "knowing" violations of the Act. *Midwest Milk, supra,* 510 F.Supp. at 526–527. Even reviewing these conclusions under a negligence standard, we cannot say they were clearly erroneous.

For all of the foregoing reasons, we affirm the district court's judgment against Mid-Am and AMPI in their Phase I and Phase III claims against NFO.

### III.

### *NFO's Claims Against Mid-Am, AMPI, CMPC and ARSPC.*

NFO's claims were tried over an eighteen-month period, comprising the bulk of the record.[14] NFO alleges that Mid-Am, AMPI, CMPC and ARSPC conspired to eliminate competition, in violation of Section 1 of the Sherman Act, and monopolized, attempted to monopolize and conspired to monopolize, in violation of Section 2 of the Sherman Act. The district court ruled that NFO failed to meet its burden of proof on any of its theories under Sections 1 and 2. *Midwest Milk, supra,* 510 F.Supp. at 434–435, 502–503.

Review of this conclusion is difficult because of the paucity of the factual findings. On many of the crucial factual issues, the court's findings consist only of seriatum rejections of findings proposed by NFO—in most instances, without explanation and without adoption of alternative findings. These "negative" findings are nonetheless against NFO on such issues, and we review all of the findings under the clearly erroneous standard. Based upon such findings, we affirm the district court's dismissal of NFO's actual and attempted monopolization claims.

The district court's affirmative factual findings and record evidence in support thereof, however, unmistakably show that AMPI, CMPC and Mid-Am illegally conspired to monopolize Grade A milk marketing and to eliminate competition in the marketing of such milk, and that NFO was a specific target of the conspiracy. This

conspiracy violates Sections 1 and 2 of the Sherman Act, notwithstanding the Capper-Volstead exemption, because it involved the concerted use of predatory and other unlawful, anti-competitive means to eliminate competition and pursue monopoly power. We affirm the dismissal of NFO's claim against ARSPC, however, because the record does not clearly establish it was a participant in the conspiracy.

#### A. *Actual and Attempted Monopolization.*

One essential element of these claims is a showing of the relevant market within which the offender achieved either monopoly power or a "dangerous probability" of such power. *See supra,* at 1181. The district court ruled that NFO failed to establish relevant product or geographic markets or make a sufficient showing of market power within a properly defined market. *Midwest Milk, supra,* 510 F.Supp. at 502.

In our view, NFO clearly established that raw Grade A milk is a relevant product market. The court's affirmative findings are sufficient to prove this element, and it was legal error not to so conclude. Briefly, the findings show that only Grade A milk may be used for fluid products for human consumption; that Grade B milk, by definition, cannot be a substitute for or be interchanged with Grade A milk for Class I uses; that demand for Grade A fluid products is relatively inelastic; that production of Grade A milk requires stricter sanitary methods and necessitates conversion costs and higher production costs than Grade B milk; that Grade A milk is supported by minimum federally regulated prices, while Grade B prices are established in the open market; and that "premium" prices negotiated by cooperatives primarily relate to Grade A milk used for Class I purposes. *Midwest Milk, supra,* 510 F.Supp. at 437–443. In any commercially meaningful sense, Grade A milk is thus a relevant product market for antitrust purposes and has been deemed such in other milk monop-

14. By contrast, Mid-Am's Phase I claim was tried over a nine-day period.

olization cases. *See, e.g., United States v. Dairyman, Inc.,* 660 F.2d 192 (6th Cir. 1981).

The relevant geographic market and market share evidence is more problematical, chiefly because it does not appear that NFO had a consistent theory of the geography underlying its actual and attempted monopolization claims. At trial and on appeal, NFO has variously asserted that the relevant geographic market is a ten-state region, or ten federal order markets therein, or a number of other submarkets, such as the regulated Chicago market (Order 30). The district court, however, found NFO's market definitions and market share data inadequate.

■ On this record, there is no doubt that AMPI, Mid-Am and CMPC are the major marketers of milk produced in the Midwest. CMPC's control of supply in the Chicago market, for example, is so great that at least one Chicago dairy simply could not meet its full supply needs without turning to CMPC. *See Midwest Milk, supra,* 510 F.Supp. at 482. Similarly, prior to NFO's entry into Grade A marketing in Missouri, "some of the Grade A milk producers in Southern Missouri had no practicable alternative other than to ship through Mid-Am." *Id.* at 469. Moreover, the official USDA milk pooling statistics reported in the findings overwhelmingly establish the significant market position of AMPI, CMPC and Mid-Am—singly or together pooling from seventy percent to over ninety percent of all milk pooled in various of the major federal order markets at issue here.[15] *Id.* at 448–449; *see also id.* at 488, 496.

■ The defendants do not deny having such significant market power. Indeed, the record reveals public assertions by Mid-Am that it controls over eighty-five percent of the Grade A milk in a number of "strategic" metropolitan markets; and similar assertions by CMPC that it represents over ninety percent of the producers selling into the Chicago market, and supplies over ninety percent of that market's fluid milk use.

The defendants, however, dispute the sufficiency of NFO's market definition and share data, arguing that it fails to account for milk which is pooled on one order but actually sold in another, or for certain unregulated milk supplies not reflected in the "pooling" statistics or for other milk movements between orders and across boundaries variously proposed as market definitions by NFO. This raises issues of fact which the district court resolved against NFO, albeit without explanation. We thus are presented with the certainty, on this record, that AMPI, CMPC and Mid-Am are the major marketers of raw milk produced in the Midwest, but with uncertainty as to monopoly power in a properly defined market or submarkets. The burden to show monopoly power or "dangerous probability" of it, however, is on NFO. We cannot say it was clearly erroneous for the district court to find that NFO's statistical evidence was not sufficiently well defined to support its claims of actual and attempted monopolization. Accordingly, we affirm the dismissal of such claims.

**B. The Conspiracy to Monopolize and Eliminate Competition.**

NFO alleges that AMPI, Mid-Am, CMPC and ARSPC conspired to monopolize and eliminate competition in the marketing of raw Grade A milk. Moreover, it alleges that the conspiracy involved concerted use of predatory and other unlawful tactics and that NFO was a specific target of the conspiracy. Such a conspiracy would violate Section 2 of the Sherman Act to the extent its aim is to unlawfully acquire monopoly power; it would violate Section 1 to the extent its aim is to unlawfully eliminate competition. *See Maryland & Virginia Milk Producers Assoc., supra,* 362 U.S. at 463, 80 S.Ct. at 851 (Sections 1, 2 and 3 "closely overlap and the same kind of predatory practices may show violations of all."). A threshold question is the nature of the relevant market and intent elements of this claim.

---

**15.** Notwithstanding defendants' assertions to the contrary, it is proper to look at such statistics collectively because the defendants were engaged in extensive joint marketing and territorial allocations and NFO alleges concerted, conspiratorial conduct. *See generally Von Kalinowski, supra,* § 8.02[3].

The record evidence as to relevant market is clearly sufficient to support NFO's Section 2 conspiracy claim. It is generally held that relevant market is not a necessary element of such a claim because actual attainment or "dangerous probability" of monopoly power are not at issue. *See supra,* at 1181–1182. In our view, a minimal showing must nonetheless be made as to the product and geographic context of the alleged conspiracy. Here, NFO made a more than adequate showing of the ten-state region within which the defendants engaged in concerted efforts to gain control over and eliminate NFO as a competitor in the marketing of raw Grade A milk. NFO has also demonstrated that the conspiracy affects a substantial amount of interstate commerce—millions of pounds of Grade A milk shipments by NFO alone. *See, e.g., Forgett v. Scharf,* 181 F.2d 754, 787 (3d Cir.), *cert. denied,* 340 U.S. 825, 71 S.Ct. 59, 95 L.Ed. 606 (1950); 3 *Von Kalinowski, supra,* § 9.02[4]. Of course, an unlawful conspiracy under Section 2 necessarily violates Section 1 as an "unreasonable" restraint of trade.[16]

The more crucial issue is the element of intent. Here, the defendants do not seriously dispute, nor could they on this record, that they acted in concert with the intent to eliminate competition and gain sufficient control of milk to enable them to set higher prices.[17] They properly argue that such intent is not unlawful, standing alone, because Capper-Volstead cooperatives may agree to eliminate competition between themselves and to pursue monopoly power through lawful means. The prohibited aim is to pursue such power or seek to eliminate competition through predatory, anticompetitive or other unlawful tactics. It is this unlawful intent which NFO must establish and which it has shown as to Mid-Am, AMPI and CMPC, but not as to ARSPC.

We summarize below the defendants' overt acts which NFO contends evidence the illegal conspiracy. Most of the actual conduct is not in dispute as much as is the inference of intent and conspiracy: whether the actions were in concert and were unlawfully intended to eliminate competition in general and NFO in particular; or whether they were unilateral actions taken for legitimate business reasons. The district court appears to have viewed the many incidents discussed below as isolated, self-contained actions. We recognize that when viewed in this manner, there is conflicting record evidence which could support findings that at least some of the conduct was not unlawful. When the conduct is viewed as a whole, however, there is only one conclusion that can be drawn. AMPI, Mid-Am and CMPC did conspire to monopolize and eliminate competition in the marketing of Grade A milk produced in the Midwest, through the use of discriminatory pricing, coercive supply disruptions and threats of similar conduct, as well as bad faith harassment and threats of litigation against independent buyers of NFO milk. Although some of the district court's "negative find-

---

**16.** The defendants concede that a Section 2 conspiracy is, *a fortiori,* a conspiracy under Section 1, *e.g.,* CMPC Br. at 35, n.134, but attempt to circumvent this by proposing a rather convoluted application of the antitrust laws. Essentially, the assertion is that NFO tried its Section 1 claim under a rule of reason approach below and should be barred from asserting a *per se* theory on appeal; that NFO's Section 1 claim fails under the rule of reason because of an inadequate showing as to market power; and that NFO's Section 2 claim should be dismissed because otherwise a gross incongruity would result from finding a Section 2 violation which is not also a Section 1 violation. Such strained reasoning has no merit here. At trial, NFO alleged concerted predatory conduct in violation of Sections 1 and 2. Such a conspiracy, if proven, is "unreasonable" under Section 1 regardless of whether the *per se* label is attached; moreover, the record evidence as to defendants' market power is sufficient to render their alleged conduct unlawful even under the rule of reason. *See supra,* at 1192.

**17.** *See, e.g.,* CMPC Ex. 767, a promotional brochure stating that CMPC "was organized for the primary purpose of improving prices to all milk producers serving" Chicago, and noting in a quiz section: "Q. Is there currently a Super Pool premium on Order 30? A. No, but there could well be if all milk producers were to join the efforts of CMPC." *See also infra,* at 1194, describing Mid-Am and AMPI consignment agreements, territorial allocations and other joint marketing efforts.

ings" are clearly erroneous, as described below, it is in large measure the court's affirmative findings—the actual conduct viewed as a whole—which establishes the unlawful conspiracy. The findings and record evidence, however, do not clearly show that ARSPC participated in the conspiracy and we therefore affirm the dismissal of NFO's claim against this co-op.

The specific overt acts of the defendants must be viewed in light of their concerted marketing practices as a whole. AMPI and Mid-Am contend they are vigorous competitors with each other, but while they have competed at various times, the concerted nature of their marketing activities is undeniable. AMPI became a member of Mid-Am and Mid-Am became a member of AMPI. They entered into consignment agreements which effectively divided up certain marketing territories in the Midwest, South and Southwest. Mid-Am consigned some of its members' milk to AMPI for sale in the Oklahoma Metropolitan, North Texas, South Texas and Central Arkansas markets. *Midwest Milk, supra,* 510 F.Supp. at 452. Mid-Am and AMPI reached a similar consignment agreement covering the Wichita market "because there was a possibility that Mid-Am was going to begin making sales in Wichita." *Id.* These reciprocal arrangements were extended to cover the St. Louis, Nebraska—Western Iowa, Des Moines, Kansas City and Twin Cities federal market orders, the result being that Mid-Am marketed AMPI milk in some areas, and AMPI marketed Mid-Am milk in others. *Id.* To help facilitate their joint activities, Mid-Am has since 1969, assigned staff as liason with AMPI "to eliminate problems which may develop between the two organizations." *Id.* at 479.

CMPC is a federation of cooperatives which exists to sell milk into the greater Chicago market. As CMPC characterizes its own federated structure, it could function only through persons employed by or representing its constituent co-ops. CMPC Br. at 50, n.168. AMPI is a member of CMPC and, moreover, serves as CMPC's marketing agent for Chicago. *Midwest Milk, supra,* 510 F.Supp. at 476. An AMPI official, for example, was chairman of the

CMPC price development committee. With these overlapping roles of AMPI and CMPC staff, it sometimes is difficult to distinguish which entity is responsible for specific actions in the Chicago market, but the generally concerted nature of CMPC and AMPI marketing efforts is obvious.

NFO began to assemble a direct marketing program in 1969, and aggressive competition ensued between NFO and AMPI, Mid-Am and CMPC, both to garner farmers as producer-suppliers and to win supply contracts from proprietary dairies. As a new entrant, NFO sometimes offered milk at lower prices than the principal co-ops, but could initially pay its members competitive prices because its overhead apparently was not as great as that of the large, established co-ops. *Id.* at 457.

NFO's marketing efforts became a serious problem for Mid-Am, AMPI and CMPC. Mid-Am viewed NFO as a competitor in the raw milk supply business, and by 1970, "Mid-Am viewed NFO as a substantial threat to Mid-Am's maintenance of its membership." *Id.* at 457–458. AMPI, too, experienced significant membership problems from NFO and commenced extensive litigation in Wisconsin with the stated purpose of protecting marketing contracts with its members. *See supra,* at 1189–1190. Moreover, AMPI, CMPC's marketing agent, was concerned that NFO's price cutting would "undermine" the premiums being paid on the Chicago market. *Midwest Milk, supra,* 510 F.Supp. at 479. The Chicago price problems were of tremendous concern to CMPC and AMPI which sold directly in that market, and were also important to Mid-Am, as one of its officials testified, because Chicago essentially functioned like a base-pricing point for other markets served by Mid-Am. *See id.;* Hanman Dep. at 180–181, 863–872.

If there could be any doubt that CMPC, AMPI and Mid-Am jointly perceived NFO as a competitive threat, such doubt is removed by the district court's express findings that Mid-Am and AMPI officials met from time to time to discuss their concerns regarding NFO and that senior officials of CMPC, Mid-Am and AMPI—during one of

the more fierce stages of the competition—assembled a joint meeting specifically to discuss NFO's "cut-rate" marketing and solicitation of their members. *Midwest Milk, supra,* 510 F.Supp. at 469, 480.[18]

Against this background, we turn to evidence of the overt acts of CMPC, AMPI and Mid-Am, largely as described in the district court's affirmative findings of fact.

### 1. *Attempt to block NFO's qualification.*

To effectively compete in the marketing of milk, NFO had to become "qualified" by the USDA on various federal market orders. *See id.* at 439–441. Mid-Am, AMPI and CMPC engaged in a series of governmental contacts aimed at blocking NFO from becoming so "qualified." Contacts were made with the Wisconsin Department of Agriculture, the Missouri attorney general, regional USDA administrators and more senior USDA officials. At one point, these defendants proposed an amendment to the definition of "cooperative association" which would have seriously hampered NFO's efforts to become qualified. Some of the letters, requests and initiatives were made by Mid-Am or AMPI alone, although copies of such correspondence were typically circulated to the other co-op or co-ops. The effort clearly was a coordinated one joined in by CMPC, AMPI and Mid-Am, the purpose of which "was to foreclose NFO from the marketing of Grade A milk under Federal Orders as a qualified cooperative." *Id.* at 458; *see also id.* at 469, 480–481.

The three co-ops contend that they objected to NFO in good faith and that, in any event, their efforts cannot constitute an antitrust violation because of the *Noerr-Pennington* doctrine. Whether the objections to NFO were in good faith is argua-

ble. When NFO became qualified to market milk in Chicago, for example, CMPC solicited NFO to join and market through CMPC. It thus would appear that at least CMPC's concern was related as much to NFO's independence as to its atypical structure.

The *Noerr-Pennington* doctrine, however, does exempt the concerted effort to block NFO's qualification. Absent a sham, joint efforts to influence public officials, even if intended to eliminate competition, are "not illegal either standing alone or as part of a broader scheme itself violative of the Sherman Act." *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530, 542–543 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). The sham exception generally involves governmental contacts which are not a genuine attempt to influence official decision making, but instead are merely an attempt to interfere directly with the business relationships of a competitor. *See Feminist Women's Health Center v. Mohammad, supra,* 586 F.2d at 543; Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 105–111 (1977). Here, NFO's structure and some of its programs were not typical of farmer cooperatives, *see supra,* at 1184–1185, and we cannot say that the attempts to block it from being deemed a qualified cooperative were not genuine attempts to influence official policymaking. Thus, the pattern of governmental contacts are not actionable alone or as an element of the larger scheme.[19]

---

**18.** CMPC contends it was not "present" at this meeting, notwithstanding that one of the attendees, McWilliams, was chairman of CMPC's Price Development Committee and was an official of AMPI, CMPC's marketing agent.

**19.** In so holding, we do not consider what role, if any, AMPI's political contributions might have played in its efforts to get the USDA to deny NFO's qualification. AMPI officials made a substantial series of allegedly unlawful finan-

cial contributions to the Nixon Reelection Committee at approximately the same time they were seeking to influence the USDA. *See infra,* at 1205. NFO apparently did not pursue at trial and does not argue on appeal that AMPI's financial contributions were linked to the joint efforts to block NFO's qualification. Thus, we need not decide whether such conduct would vitiate the exemption which is otherwise applicable here.

■ Exempt conduct may be considered, however, to the extent it tends to show the "purpose or character" of other, nonexempt activity. *United Mine Workers v. Pennington, supra*, 381 U.S. at 671 n.3, 85 S.Ct. at 1594 n.3; *Feminist Women's Health Center v. Mohammad, supra*, 586 F.2d at 543; *Webb v. Utah Tour Brokers Assoc.*, 568 F.2d 670, 672 (10th Cir. 1977). Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative. While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.

### 2. *Gandy Dairy.*

AMPI's handling of Gandy Dairy in the Central West Texas Market Order is one unequivocal illustration of predatory conduct aimed at coercing buyers to eliminate their purchases from independents. The district court's affirmative findings of fact and underlying record evidence may be summarized briefly. *See Midwest Milk, supra*, 510 F.Supp. at 474.

Prior to May of 1971, Gandy Dairy purchased all of its Grade A milk from AMPI. In March and April of that year, however, Gandy arranged to purchase part of its supply from four independents. An AMPI official met with Gandy in April to discuss such purchases and, according to one Gandy participant, expressed AMPI's "disappointment" and indicated he "didn't know what his people might do * * * There were two or three possibilities."[20] AMPI's response became clear. The very day that the independent shipments commenced, AMPI began short-shipping Gandy and making late deliveries of the milk which it did deliver. Simultaneously, AMPI's Gold Spot Division began soliciting Gandy's customers, offering them competing products at prices close to Gandy's cost of production. The purpose and intent of these efforts was "to get Gandy to return to AMPI for its full requirements of milk." *Id.*

■ Although the supply shorting and late deliveries persisted only briefly, they functioned as a warning to Gandy of the disruption it risked by making independent purchases. Similarly, the solicitations of Gandy's customers—perhaps lawful under other circumstances—were clearly part of the effort to put further pressure on Gandy. The conduct as a whole was blatantly predatory.

AMPI's defense essentially is that its Gandy Dairy efforts were not directed specifically at NFO and that, in any event, NFO was not causally harmed because Gandy's decision not to purchase NFO milk was based upon price considerations, not AMPI's conduct. We find this unpersuasive. NFO was actively soliciting Gandy at the time of AMPI's predatory conduct. By definition, AMPI's attempts to secure a *full-supply* arrangement are directed at eliminating all non-AMPI suppliers. Moreover, the record shows that while price may have been a significant factor in Gandy's negotiations with NFO, it also shows that Gandy officials feared further AMPI retaliation if they made additional independent purchases beyond those which initially triggered the predatory conduct. On this record, to adopt AMPI's position would mean that clearly predatory conduct is excused when it is only partially successful or only one factor influencing the target company. We decline to adopt such a position.[21] AMPI's unlawful conduct toward Gandy is also significant because it tends to show an unlawful intent behind similar AMPI conduct which was directed even more specifically at NFO. *See Kansas City Star Co. v. United States*, 240 F.2d 643, 650–651 (8th Cir. 1957) (kindred acts doctrine).

### 3. *Wanzer Dairy.*

The Chicago market informally functions as a base-pricing point for many markets

---

20. Chandler Dep. at 85–86.

21. Of course, in assessing damages, the district court may consider the extent to which NFO's harm is attributable to AMPI's conduct. *See infra*, at 1209–1210.

south and west of Chicago. *See supra,* at 1179–1180, 1194. The record is replete with statements by Mid-Am, AMPI and CMPC officials with respect to the importance of establishing a "superpool" or premium (over-minimum price) for Chicago milk. Accordingly, AMPI and CMPC aggressively sought to establish such a premium. Their efforts, however, included discriminatory pricing and coercive threats toward the Wanzer Dairy,[22] a substantial Chicago dairy whose purchases from NFO and others had undermined the CMPC premium.

The major trade association of proprietary milk buyers in metropolitan Chicago, AMDI, had a Producer Relations Committee which met from time to time with CMPC's Price Development Committee. AMDI dealers continually protested paying a premium for CMPC milk while another proprietary—Wanzer Dairy—was buying non-CMPC milk (including NFO milk) at lower prices. *Midwest Milk, supra,* 510 F.Supp. at 477–478, 482. CMPC dropped the premium in early 1970 and successfully reinstated it in January, 1971, after Wanzer entered into a committed supply contract with CMPC. It is the conduct employed in securing the Wanzer supply contract which is primarily at issue. The parties vigorously dispute whether such conduct also evidences that CMPC unlawfully conspired with the nonexempt AMDI group and what effect securing the Wanzer contract had on NFO. We first summarize the district court's affirmative factual findings.

Throughout the period at issue, Wanzer Dairy purchased from both independents and CMPC. It initially purchased from North Central Dairymen's Cooperative (NCDC) at prices below any CMPC premium, but by October of 1970, NCDC had joined and was marketing through CMPC. *Id.* at 478, 480. In April of 1970, when NCDC and others were independently selling into Chicago, CMPC issued a discriminatory price announcement which imposed a number of additional service charges, applicable in part to any buyer "who accounts to and settles with CMPC for less than 100% of his Class I requirements [fluid Grade A products]."[23] *Id.* at 478.

Wanzer continued to make independent Class I purchases, including major purchases of such milk from NFO which commenced in July of 1970, and reached nearly ten million pounds of such milk per month during the fall peak. *Id.* at 479. In October of 1970, after NCDC had begun marketing through CMPC, CMPC announced a new discriminatory price structure, elements of which again applied to any dealer "who does not report to or settle with CMPC for his total Class I requirements,"[24] notwithstanding questions raised at the CMPC Board meeting concerning the legality of the new pricing. *Id.* at 480.

A flurry of exchanges between Wanzer, Southland (Wanzer's parent corporation), CMPC and NFO followed in November and early December of 1970—a period in which Wanzer sought to buy all of the NFO milk

22. AMPI was a member of and marketing agent for CMPC. The chairman of CMPC's Price Development Committee was an AMPI regional manager. Thus, although we refer in this subsection to CMPC, some of the contacts discussed were made by AMPI officials and, clearly, both must be viewed as responsible for their joint role in the Chicago marketing.

23. The price announcement imposed a series of service charges for both full supply and partial supply buyers. For example, a handling charge was imposed for quantities of milk actually supplied by CMPC, at one rate for seven-day-a-week committed supply shipments and at a higher rate for less frequent deliveries or for supplies not subject to a *committed* seven-day-a-week arrangement. An additional "market service charge" was imposed, for full and partial supply customers, consisting of a flat fee for all Class I usage, regardless of the source of supply. In lieu of the actual handling charge plus the "market service charge," a buyer could pay a substantially higher rate just for the milk supplied by CMPC. Thus, although no buyer was forced to take a full supply from CMPC or to reach a committed supply agreement, the discriminatory pricing scheme created a substantial inducement for doing so. CMPC contends that the pricing scheme was a legitimate attempt to recoup the higher unit costs of filling supply needs of less regular buyers. *See infra,* at 1198–1199.

24. Essentially, the new announcement raised the "market service charge" applicable to all Class I usage and raised the much higher optional charge. *See* note 23, *supra.*

that it could but, as a practical matter, was forced to buy at least some milk from CMPC in order to meet its total supply needs. *Id.* at 481–482. Following the October price announcement, Wanzer notified NFO that it would cease NFO purchases and notified CMPC that it would comply with one option under the new price announcement.[25] *Id.* at 482. NFO offered to reimburse Wanzer against additional service charges and, for one month, Wanzer continued its split NFO–CMPC purchases while negotiations with CMPC continued. *Id.* By early December, Wanzer notified NFO that it would make its Class I purchases on a day-to-day basis. *Id.* at 483. On December 2, CMPC and AMDI dealers met and discussed, *inter alia*, whether Wanzer would pay CMPC's "market service charge." *Id.* AMDI dealers renewed their objection to paying more for milk than their competitors and specifically to paying any CMPC premium as long as their competitors were buying at a lower price. *Id.* at 482. On December 10, CMPC by letter notified Wanzer and Southland [26] that it was cutting off all supplies, effective in five days, because "we have become aware that you have been engaged with others in unlawful attempts to interfere with producers whose milk is subject to effective marketing agreements with CMPC and its members." [27] *Id.* at 483. CMPC did not terminate shipments after this threat, but instead made shipments on a day-to-day basis while negotiations continued. *Id.* Within days, Wanzer entered into a one-year committed supply contract with CMPC for major Class I purchases. *Id.*

The Wanzer-CMPC negotiations were the specific subject of various AMPI and CMPC discussions with AMDI dealers concerning reinstatement of a premium. *Id.* at 482–

483. After the Wanzer-committed supply contract was reached, CMPC met with AMDI dealers, showed them the Wanzer contract and, within a few weeks, successfully reinstated an over-order premium. *Id.* at 483.

■ The foregoing events and chronology are summarized from the district court's affirmative findings of fact. In our view, the conduct described in such findings is plainly predatory. Simply put, CMPC and its agent AMPI sought to establish a premium for their milk, a goal which was obstructed by AMDI dealers' objections to Wanzer's purchase of much of its Class I needs from non-CMPC sources at lower prices, including NFO milk. Facing continuing rejection of a premium under these conditions, AMPI and CMPC employed discriminatory pricing and coercive threats of supply cutoffs against Wanzer, secured a substantial committed supply agreement from Wanzer, showed this contract to the other dealers and, within weeks, successfully imposed a new premium. The attempts by CMPC and AMPI to explain away each step of the campaign against Wanzer cannot obscure this overriding factual pattern.

CMPC contends that the price discrimination was simply a legitimate attempt to recover costs associated with supplying less regular customers. Such a contention might be valid in some other context, but the conduct here—viewed as a whole—clearly establishes an unlawful purpose. In addition to the conduct itself, the record reveals testimony by a CMPC official that, in adopting its pricing scheme, CMPC's major concern was with "the split supply sources at the Wanzer Dairy." An AMDI dealer, who was present in meetings with AMPI and CMPC regarding the price structure, also testified that the higher service

---

**25.** Wanzer indicated it would pay the "market service charge" and not the higher "in lieu of" option. *See* note 23, *supra.*

**26.** Southland, Inc., also was negotiating with AMPI to get supplies for its facilities in Texas, Oklahoma and Memphis. *Midwest Milk, supra,* 510 F.Supp. at 482.

**27.** This threat relates to AMPI's contention that some NFO milk came from Wisconsin produc-

ers who were obligated to market through AMPI. AMPI commenced extensive litigation against NFO on this issue. *See supra,* at 1189–1190. Threatened litigation against buyers of NFO milk was employed elsewhere by AMPI and Mid-Am, and threatened supply cutoffs were also employed by AMPI in other markets. *See infra,* 1200–1203.

charges were designed to affect plants buying lower-priced milk from NFO and directly from farmers and to make such plants "realize that they would be better off if they participated [in CMPC's pool] on a weekly basis or daily basis" and, moreover, confirming that the Wanzer committed supply contract was critical to restoring any CMPC premium.[28]

CMPC also attempts to characterize its problems with Wanzer as deriving from hostility by Wanzer's local manager toward CMPC; contends its threatened supply cutoff was simply a legitimate response to AMPI's membership dispute with NFO; and implies that the committed supply contract was achieved in the ordinary course of business once Wanzer's parent company officials entered negotiations. See CMPC Br. at XXXIX–XLIV, 67–68. This version of events is contradicted by the testimony of the Southland official who negotiated the supply contract, which indicates that Southland threatened legal action against CMPC to counter the impending supply cutoff and also shows that Wanzer's decision to enter into the committed supply contract was prompted largely by the pricing scheme imposed by CMPC. Moreover, the CMPC version is simply untenable in light of the record as a whole.

In looking at the evidence underlying the findings, we do not contemplate a *de novo* review. We recognize there are some conflicts in testimony; that some witnesses deny or attempt to explain away what others admit. CMPC's conduct itself, however, is the strongest evidence of an unlawful purpose and such conduct is largely established in the district court's affirmative findings. In our view, the conduct so established is predatory on its face. Our examination of the underlying evidence only confirms that an inference of unlawful purpose must be drawn. It was clear error for the district court not to find that the pricing scheme was unlawfully discriminatory and that the threatened supply cutoff was unlawfully coercive.[29]

■ We affirm, however, the district court's rejection of the claim that CMPC conspired with AMDI dealers to fix prices and to boycott NFO. In our view, the record simply does not support an inference that AMDI dealers' decisions not to buy from NFO were linked by any conspiratorial boycott agreement with CMPC. Such decisions may have been influenced by CMPC's conduct (which may go to damages issues), but that does not rise to the level of conspiracy. On the other hand, the record would support an inference of conspiracy to fix prices between AMDI and CMPC, but the evidence is not so strong as to make the district court's contrary conclusion clearly erroneous.

---

**28.** *See* Tr. at 15, 446; Wells Dep. at 58–66. The record also reveals the testimony of a Mid-Am officer that it was his understanding from AMPI officials that the Chicago pricing was designed to respond to the Wanzer-NFO problems. The latter evidence may be hearsay but it nonetheless corroborates the other evidence as to purpose; and coming from a codefendant in a conspiracy case, has more than usual guarantees of trustworthiness.

**29.** CMPC also disputes the precise effect which the Wanzer contract had on NFO's marketing. Wanzer continued to buy a small percentage of its Class I needs through NFO, but the bulk of NFO's sales to Wanzer involved Class II allocations. CMPC contends this reflects a voluntary cutback and diversion by NFO to other Class II uses, which at the time garnered a higher price for NFO members. NFO contends that it lost Wanzer as a Class I outlet because Wanzer's committed supply contract with CMPC, while not a total supply contract, required Wanzer to allocate its CMPC purchases to Class I uses. The findings are not particularly helpful on this issue and the record is mixed. The findings do show, however, that NFO repeatedly and unsuccessfully sought alternative Class I outlets in the Chicago market, *Midwest Milk, supra,* 510 F.Supp. at 484, at the very time that, according to CMPC, NFO was "voluntarily" cutting back Class I sales to Wanzer. Moreover, the Southland official who reached the supply agreement testified that although Wanzer was still interested in purchasing from NFO, the committed supply arrangement with CMPC would mean a reduction in the proportion of Wanzer's needs which would be purchased from NFO. In our view, this record sufficiently establishes the fact of injury to NFO, such that the extent of harm and precise effect of the Wanzer contract only go to the question of the amount of damages. *See infra,* at 1209–1210.

### 4. Litigation and related harassment.

Mid-Am and AMPI filed separate actions against NFO in Wisconsin and Missouri, based upon membership disputes and alleged antitrust violations, issues on which NFO largely prevailed.[30] The membership dispute involved a claim that some farmers' marketing through NFO were contractually obligated to market through Mid-Am or AMPI and that NFO had induced these farmers to breach such agreements. Based upon this claim, Mid-Am, AMPI and, in one instance, CMPC on behalf of AMPI, engaged in a pattern of litigation, threatened litigation and related harassment against independent buyers of NFO milk. The controlling legal principle is clear in this case. Resort to judicial processes is exempt from antitrust attack under the *Noerr-Pennington* doctrine, unless it may be characterized as a sham cover for what is really just an attempt to directly interfere with the business relations of a competitor. *See, e.g., Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977); *United States v. Otter Tail Power Co.*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Hahn, Inc. v. Codding, Inc.*, 615 F.2d 830, 839–841 (9th Cir. 1980). Here, the actions directly against NFO come within the exemption, but the conduct directed toward NFO's customers clearly constitutes bad faith, unlawful harassment.

We recognize that the litigation directly against NFO was intended in part to hamper NFO's ability to compete. The burdensome cost of the litigation was one factor. Notes from internal AMPI meetings and corroborating testimony show, for example, that senior AMPI officials considered sponsorship of additional third-party litigation against NFO in the hope that the added cost of such litigation would "break NFO's back."[31] Such third-party litigation was filed and was conducted by the same attorneys who represented AMPI, although the record does not clearly establish that it was brought in bad faith. Other evidence as to the goal of the litigation is that when Mid-Am commenced its action, it intended to have its membership certified as a class so as to restrict communication by NFO with Mid-Am's members during the pendency of the litigation. Mid-Am's action was also selectively directed at NFO: Mid-Am did not bring actions against other co-ops that the court found had solicited Mid-Am members to breach their Mid-Am marketing contracts. *Midwest Milk, supra*, 510 F.Supp. at 471.

Notwithstanding the foregoing evidence of intent, we cannot say that the legal claims against NFO were so groundless as to come within the "sham litigation" exception to the *Noerr-Pennington* doctrine. There were genuine disputes regarding NFO's solicitation methods. Thus, in our view, the direct litigation against NFO is not actionable as an antitrust violation.

Mid-Am, AMPI and CMPC, however, used the membership disputes with NFO as a pretext for threatening litigation against and otherwise harassing proprietary dairies which bought or considered buying NFO milk. At least one court has ruled that directing such conduct toward a competitor's customers is clearly outside the *Noerr-Pennington* exemption. *See Oahu Gas Serv. Inc. v. Pacific Resources, Inc.*, 460 F.Supp. 1359, 1386 (D.Hawaii 1978). Here, Mid-Am, AMPI and CMPC argue that their conduct was intended merely to protect their legitimate marketing rights. Any legitimate claims as to unlawful membership "raiding," however, could be fully pursued and vindicated in direct actions against NFO. The co-ops might also have sought specific performance of their marketing contracts. The findings and record evidence reveal instead a broad pattern of litigation threats and harassment against buyers of NFO milk. There may be circumstances in which actions against a competitor's customers are in good faith but, here, the pattern of conduct plainly establishes that the purpose was to put proprietary

---

**30.** AMPI's claims were asserted in Wisconsin state court and in a counterclaim in the present action; Mid-Am's claims commenced the present action. *See supra*, 1181, 1189–1190.

**31.** *See, e.g.*, NFO Ex. 1523.

buyers into the middle of the membership dispute and to make NFO milk "too hot to handle," all in order to deter such companies from dealing with NFO.

As noted above, AMPI's claim with respect to rights over certain Wisconsin milk marketed by NFO was the pretext for CMPC's threat to cut off Wanzer Dairy's supplies. *See* note 27, *supra.* Subsequently, when AMPI wrote to NFO announcing its intention to sue NFO and demanding certain payments for such milk, copies of the threat and demand were sent to Wanzer Dairy and to its parent corporation, Southland. Similarly, after NFO began making sales to Kraml Dairy in Chicago, AMPI wrote to Kraml asserting that some of the NFO milk was subject to AMPI's marketing rights' claim and demanding that AMPI be paid directly for such milk.

The pattern is hardly limited to AMPI and CMPC. Mid-Am participated in a number of threats, including some against dairies with which AMPI was having problems. Perhaps the most blatant threat involves the Beatrice Company's facility at Fort Worth, Texas, which had been a full supply customer of AMPI. The court's findings and underlying record evidence show that through most of 1970 and 1971, Beatrice and AMPI engaged in negotiations over maintaining AMPI purchases when AMPI's price was higher than the price paid by a number of Beatrice's competitors who were buying non-AMPI milk. *See Midwest Milk, supra,* 510 F.Supp. at 470. AMPI vigorously sought to retain its sales and premium price. At least one source of pressure on Beatrice apparently involved Beatrice's Tulsa facility, which faced competition from AMPI's Gold Spot division whose pricing practices prompted further complaints from Beatrice to AMPI. *Id.* at 471.

In any event, Beatrice began making purchases from or through NFO in July, 1970, and the volume of such purchases increased to several million pounds per month by February, 1971.[32] *Id.* The NFO milk sales in part involved milk from Missouri producers which Mid-Am asserted it had the right to market. In late 1970 or early 1971, Mid-Am advised Beatrice of its claim that NFO's marketing was illegal; in February, 1971, Mid-Am met with and corresponded with Beatrice to press its claim, demanding certain payments for the disputed NFO milk, threatening legal action against Beatrice and, on March 12, 1971, sued Beatrice along with NFO. *Id.* at 472–473. In late March, 1971, Beatrice notified NFO that because of payment disputes and NFO's unwillingness to indemnify Beatrice against the possible double payment situation, it was immediately terminating its NFO purchases from the Springfield facility. *Id.* at 462.

The Beatrice incident is just one illustration of Mid-Am's conduct. The Kraft Dairy in Springfield, Missouri, had been scheduled to receive NFO milk shipments at about the time that the Beatrice cutoff occurred. *Id.* at 473. Mid-Am wrote to Kraft, indicating it had become aware of a "situation" which might involve Kraft in Mid-Am's claim over some of the milk marketed through NFO's Springfield plant, and enclosed a copy of Mid-Am's complaint which had been filed against NFO and Beatrice. The letter stated that Mid-Am had not yet investigated "the extent of involvement of Kraft," but that Mid-Am wanted to know "what agreement Kraft Foods has made with respect to the price of this milk, with whom, and when payment will be commenced." At approximately the same time that Beatrice cut off NFO, Kraft notified NFO that it would no longer buy NFO milk. *Id.*

In May of 1971, NFO began selling milk to Marigold Dairy in Fort Worth. *Id.* at 474. On May 4, Mid-Am wrote Marigold to the effect that Mid-Am had learned of a "possible sale of Grade A milk of Missouri

---

**32.** Although the record is somewhat unclear, many of the shipments apparently involved "independent producer" milk—transactions arranged through NFO as "independent" sales when NFO was not yet qualified on a particular federal market order. It is clear, however, that

Mid-Am's threats were directed at purchases of milk "by or through" NFO which allegedly were in breach of Mid-Am's marketing rights; and that Beatrice directed its termination notice to NFO, not to individual producers.

producers by or through the auspices of" NFO to Marigold. The letter described Mid-Am's claims regarding some of such milk and indicated that if its understanding of the possible sale was confirmed, then Mid-Am would "enforce its contractual rights including the right to receive payments for said milk." Marigold ceased buying NFO milk later that same month. *Id.*

Another illustration is found in the deposition testimony of the president of Cloverleaf Creamery, a Twin Cities' dairy that had purchased NFO milk:

> They [Mid-Am and TCMPA] told me that you buy milk from NFO and you are going to get yourself involved in some kind of a lawsuit spending all sorts of time involving yourself. And here I am. By God, they told the truth.[33]

There is, finally, substantial evidence that Mid-Am's practice of threatening or harassing buyers of NFO milk was planned as a strategy at Mid-Am board meetings. A Mid-Am director admitted that at a board meeting shortly after filing the suit against NFO and Beatrice, Mid-Am's counsel asked the Board and staff to notify him of any NFO dealer solicitations so that he could inform such dealers that they might become involved in a lawsuit if they bought from NFO. Mid-Am's subsequent conduct shows that the board room discussion was not merely idle talk.

Mid-Am and AMPI ignore most of the foregoing incidents in their argument on appeal. On the one incident which is addressed—the Beatrice situation—Mid-Am does not attempt to justify its actions against Beatrice, but instead argues that its conduct was not the primary cause of Beatrice's termination of NFO purchases.[34] This argument misses the point. The *effect* of threatening conduct goes to the question of damages; it does not in any manner explain or justify the conduct itself. We must look to the complaint Mid-Am initially filed against Beatrice, which alleged essentially that Beatrice was a coconspirator with NFO in an antitrust conspiracy to reduce or eliminate "responsible cooperatives" like Mid-Am. On this record, however, all Beatrice had done was arrange to buy milk through NFO. That Mid-Am voluntarily dismissed Beatrice as a defendant, after Beatrice had stopped purchasing NFO milk, speaks volumes. Mid-Am's conduct as a whole, moreover, shows that its action against Beatrice was more a springboard for threatening other dairies than it was a legitimate complaint against Beatrice.

The only justification for the conduct directed against Wanzer Dairy would be that a Wanzer official appears to have assisted NFO in its efforts to get its cheaper milk

---

**33.** Holcombe Dep. at 89. Holcombe apparently was deposed by NFO and was never actually sued by Mid-Am. The testimony is cited here only because it corroborates the other evidence that the pattern of threatened litigation was very broad in scope.

**34.** Both Mid-Am and AMPI contend that Beatrice's cutoff of NFO was a unilateral, uncoerced business judgment based upon price and quality considerations. Much of the support for this contention is drawn from developments after the termination, which might relate to why Beatrice did not subsequently resume NFO purchases, but which does not bear on the reasons for the March, 1971, cutoff. As to that cutoff, the termination letter itself and contemporaneous deposition testimony of the Beatrice officials involved in the decision leave no doubt that the acute factor behind the cutoff was Mid-Am's legal claim. This is fully corroborated by the testimony of the Foremost official as to what Beatrice told him immediately after the cutoff when Foremost considered buying the milk. *See infra,* at 1203–1204. Beatrice did not resume NFO purchases and NFO came to view Beatrice and other dairies as "coerced coconspirators;" indeed, NFO later named Beatrice as a defendant although this claim was subsequently settled. It is in this light that one must view the 1973 deposition of a Beatrice official suggesting, inconsistent with his 1971 deposition, that Beatrice's cutoff was a matter of "purely economics." Whatever price or other problems may have accompanied NFO milk, the undisputed facts are that Beatrice purchased an ever-increasing volume of such milk for a nine-month period continuing right up to the sudden cutoff, which came twelve days after Mid-Am filed suit against Beatrice. In view of the timing and other contemporaneous evidence and the fact that the cutoff was made in consultation with Beatrice's legal department, there is simply no doubt that the Mid-Am litigation was a material cause of the cutoff.

marketed into Chicago. The discriminatory price treatment and other coercive conduct toward Wanzer, however, clearly establish that the true reason for harassing Wanzer was simply to deter NFO purchases so as to secure and maintain as large a supply as possible through CMPC.

No specific justification has been asserted for attempting to harass Kraft Dairy, Marigold Dairy or Kraml Dairy, nor has any justification been offered for Mid-Am's policy of broadly seeking out dealers which NFO was soliciting to "warn" them of possible litigation. The only defense offered is the generalized assertion of Mid-Am and AMPI that they intended only to protect their legitimate marketing rights over certain farmers' milk. There is simply no evidence in this record, however, that proprietaries were engaged in any sort of scheme to induce farmers to breach their marketing contracts with any co-op. Those who bought or considered buying from NFO were merely interested in obtaining an independent, hopefully cheaper source of supply.

When this pattern of litigation, threats of litigation and related harassment is viewed as a whole, it becomes obvious that such conduct was an unlawful attempt to deter dairies from buying NFO milk. The district court's findings are clearly erroneous to the extent they fail to recognize these incidents and reject or fail to draw the inferences which we have found inescapable from the record as a whole.[35]

### 5. *Foremost Dairy.*

The evidence relating to NFO's attempted 1971 sale to Foremost Dairy clearly demonstrates the cumulative effect of coercive conduct by Mid-Am and AMPI.

Foremost had a facility in Springfield, which was supplied by Mid-Am, and one in Dallas, which was supplied by AMPI and at various times in part by independents. The Springfield facility is not at issue in the 1970–1971 time frame. Foremost's dealings with AMPI at its Dallas plant are another matter. The principal Foremost witness, James Rudy, testified to certain "confrontations" with AMPI over Foremost's periodic purchases of independent, non-AMPI milk—incidents involving two AMPI staff members, Joe Murphy and J. G. Anderson. Murphy is the undisputed author of a 1969 memorandum to superiors recommending that AMPI engage in short-shipping of Foremost and another dairy in order to "resolve" the nonmember, independent purchase problem.[36]

Rudy's testimony and contemporaneous memoranda indicate that Foremost experienced short-shipping by AMPI in 1969, and that Anderson of AMPI threatened similar conduct in 1970, both times—in Foremost's view—due to independent purchases by Foremost. AMPI concedes "a brief interruption" in its supply to Foremost in 1969, AMPI Br. at 42, but denies any threat in 1970. The person who is alleged to have made the 1970 threat, however, testified only that when he learned Foremost would make certain independent purchases, he told Rudy, "I was disappointed they were going to and that I hated to lose those sales," but he could "not recall" saying anything else.

This is the background against which Foremost's March, 1971, rejection of NFO milk must be viewed. NFO's offer to Foremost involved a shipment assembled for Beatrice which was cancelled by Beatrice, as noted above, about two weeks after Mid-Am's suit was filed against Beatrice. NFO offered it to Foremost, in what Rudy char-

---

**35.** Implicit in the findings may be determinations as to the extent to which NFO was harmed by this aspect of defendants' conduct. Such questions can be fully considered upon remand.

**36.** The district court's finding that "there is no evidence that anyone acted on the recommendation proposed by Murphy" is clearly erroneous. Murphy's own testimony that no one

liked his idea must be viewed in light of his admission that he actively destroyed documents under the direction of one of his superiors. *See infra,* at 1205. Moreover, the evidence establishes actual and threatened supply cutoffs or short-shipping against Gandy Dairy (by AMPI) and Wanzer Dairy (by CMPC on behalf of AMPI), in addition to the 1969 Foremost incident.

acterized as a rather "desperate" manner. Upon receiving the offer, Rudy contacted Beatrice to ascertain why they were cancelling the shipment, and was told about the Mid-Am litigation and certain problems with the market administrator.[37] Rudy indicated that he was told "that all they [Beatrice] had tried to do was to buy the milk and they ended up involved in litigation and they decided it was in their best interest to discontinue purchasing the milk." Rudy then contacted NFO and turned down the milk, indicating the Springfield facility was adequately supplied by Mid-Am; and that with respect to the Dallas plant, he was not ready to "take the plunge" by buying NFO milk. Rudy stated that to "take the plunge" meant risking possible new "confrontations" with AMPI similar to the 1969 and 1970 incidents noted above; but he also indicated that the primary consideration involved the "legal implications."

The arguments of Mid-Am and AMPI on this incident confirm NFO's complaint. AMPI emphasizes that it never discussed the 1971 NFO shipment with Foremost, pointing to Rudy's testimony that his decision was "independent and objective" and that no one from AMPI told him to reject the NFO milk. AMPI also underscores the role of Mid-Am's litigation against Beatrice as a factor in Rudy's decision, notwithstanding Rudy's stated concern over possible retaliation from AMPI. AMPI Br. at 43, 44 n.45. Mid-Am, on the other hand, argues that Rudy's decision was based "solely" upon his discussion with Beatrice and not upon "anything Mid-Am said or did." Mid-Am Br. at 56. It is clear that neither AMPI nor Mid-Am directly threatened Foremost concerning the 1971 NFO shipment. It is equally clear that Foremost's "objective" decision to reject that shipment was pervaded by Mid-Am's litigation tactics against buyers of NFO milk and AMPI's prior reprisals for independent purchases. The only real dispute in the record is over which of these factors was more dominant in Foremost's decision.

Viewed in the larger context of the overall conduct engaged in by these co-ops, the Foremost incident gives rise to only one conclusion: NFO was caught in a whipsaw created by the coercive conduct of AMPI and Mid-Am toward buyers of independent milk in general, and of NFO milk in particular.

### 6. *Other overt acts.*

NFO alleges a number of additional incidents or actions as evidence of an unlawful conspiracy, including certain membership and hauler terminations, milk pooling practices and acquisitions and mergers. Most of this conduct would be lawful standing alone or in some other context but, here, we agree with NFO that some of the conduct was unlawfully aimed at eliminating NFO as a competitor.

One such action involves Mid-Am's response to members who terminated their relationship with Mid-Am in order to market through NFO. The district court's affirmative findings reveal a pattern of efforts designed to thwart such movements. In one incident, Mid-Am refused to honor termination notices from thirteen NFO members because they were one day late. *Midwest Milk, supra,* 510 F.Supp. at 495. In other instances, Mid-Am refused to reveal termination dates. *Id.* at 471, 475. Moreover, after the present litigation was commenced, Mid-Am—virtually as a policy—either refused to acknowledge or to honor termination notices from members known to be related to NFO activities, generally regardless of the producers' right to terminate. This conduct was obviously intended to hamper NFO's ability to secure producers and, in turn, to supply customers.

Both the significance and possible mootness of this conduct are reflected in the consent decree entered in the government's antitrust action against Mid-Am.[38] That

---

**37.** The NFO milk apparently was shipped as independent-producer milk and, from time to time, questions would arise as to identification of the proper party to pay for such milk. The risk of double payment became acute when Mid-Am made payment demands and ultimately commenced its litigation.

**38.** We recognize that consent decree proceedings do not establish any ultimate factual or legal conclusions in lieu of a trial. We note the

action was consolidated before the same court which heard the immediate case. One finding from the consent decree proceedings is that Mid-Am's market power is "based upon its power to require farmers to become or *to remain* members, rather than upon ownership of assets." *United States v. Mid-Am, Inc.*, 1977–1 Trade Cases ¶ 61,-508 at 71,977 (emphasis added). Under the consent decree, Mid-Am was required, for one year, to permit any terminations upon thirty days notice; thereafter, Mid-Am could adopt one-year contracts, but for a period of five years, such contracts would be subject to certain requirements which facilitate terminations. *Id.* at 71,978.

Another action involves a dairy farmer, Billy Stacey, who shipped through Mid-Am and also was a contract hauler for Mid-Am in Southwest Missouri. Stacey became active in assisting NFO's efforts to establish a reload facility and, as the district court found, was fired by Mid-Am because of his activities in helping NFO. *Midwest Milk, supra*, 510 F.Supp. at 471–472.[39]

Perhaps the most egregious conduct revealed in this case relates to suppression and destruction of evidence by AMPI. In connection with this conduct, the district court granted NFO's motion for Rule 37 sanctions, but reserved ruling on the question of which sanctions to impose, apparently indicating that a monetary award may be appropriate. *See* AMPI Br. at 69. The conduct may be described simply: AMPI engaged in a deliberate pattern of shuffling and hiding documents—to warehouses, homes or other locations—specifically to avoid discovery. Some of this conduct was uncovered during the government's participation in the litigation and most of the suppressed documents appear to have ultimately surfaced. Such conduct required extensive additional proceedings to ascertain the scope of suppression and no doubt also required further review by NFO

of virtually every aspect of AMPI's involvement in the case.

More serious is the stipulated fact that AMPI ordered the destruction of documents and that some were in fact destroyed. The district court characterized this conduct as involving "admitted bonfires." The scope of destruction remains unclear and AMPI disputes the relevancy of the destroyed documents. AMPI was involved in a series of substantial, allegedly unlawful political contributions which became the subject of the Senate Watergate investigation. Before the Senate group, at least one AMPI official who ordered destruction contended that the documents related to NFO and possible antitrust claims against AMPI, not to political matters. Other AMPI officials, on whose testimony AMPI now relies, claim the destruction related to political contributions, not antitrust matters. One of those who actually destroyed documents, Joe Murphy, contends the documents he destroyed related to his efforts to secure a merger and to certain Texas marketing activity, but not to any NFO matter. This individual is also the author of the memo proposing to short-ship Foremost Dairy and others to eliminate independent purchases, a document which managed to survive.

We can only describe AMPI's conduct as outrageous. Obviously, the relevance of and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist. Under the circumstances, AMPI can hardly assert any presumption of irrelevance as to the destroyed documents. On this record, the district court properly could have imposed the most severe sanctions upon AMPI—dismissal of its claims and default judgment against it on NFO's claim. Nonetheless, we cannot say it was an abuse of discretion not to do so. *See Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989 (8th Cir. 1975). It was error, however, not

---

decree's possible mootness effect only in the sense that conduct conforming to the decree might well bear on the need for or scope of injunctive relief fashioned on remand. *See infra*, at 1210.

**39.** Here again, the Mid-Am consent decree forbids exclusive hauling agreements, which may bear on the scope of injunctive relief fashioned here on remand. *See* 1977–1 Trade Cases ¶ 61,508 at 71,977.

to draw factual inferences adverse to AMPI on matters undertaken in or through offices and individuals involved in the destruction of documents.[40] *See In Re Grace Line, Inc.,* 517 F.2d 404, 409 (2d Cir. 1975); *Cecil Corley Motor Co., Inc. v. General Motors Corp.,* 380 F.Supp. 819, 859 (M.D.Tenn.1974).

NFO also contends that the acquisition and merger campaigns of Mid-Am and AMPI were intended to eliminate NFO, a finding which the district court rejected. There were so many mergers and acquisitions that it would be impossible to describe, even briefly, the evidence relating to each such transaction. Several overriding conclusions, however, are quite clear. Mid-Am and AMPI engaged in broad efforts to merge with formerly independent co-ops and, during a period of massive consolidation, successfully emerged as tremendously expanded entities. One purpose of these efforts, without doubt the dominant intent, was to consolidate marketing control over sufficient quantities of milk as to set and obtain higher prices for such milk. It is lawful, however, for Capper-Volstead cooperatives to specifically pursue monopoly power and, indeed, NFO itself supported the merger trend until 1969 when it undertook its own direct marketing program. Such mergers are unlawful when achieved through coercive, predatory tactics. *See supra,* at 1182–1183. Mid-Am and AMPI also acquired a number of independent proprietary dairies. Standing alone, such acquisitions may lawfully be intended to achieve production economies or similarly legitimate aims of a cooperative. Such acquisitions, however, may not lawfully be employed to foreclose competition.

Thus, the overriding issue is one of tactics and intent. Here, most of the co-op mergers were clearly voluntary. There is substantial evidence, however, that certain milk pooling practices engaged in by Mid-Am and AMPI were designed to pressure independent co-ops and individual producers to join with Mid-Am or AMPI. Although the pooling practices are quite complicated, the alleged scheme essentially involved manipulating the regulated market price system as follows: pooling additional milk supplies in a given market order so as to depress the blend price, while maintaining higher actual pay prices for the co-op's members through receipt of option payments on the out-of-order milk. In some instances, the so-called "pressure pooling" or "pool loading" was alleged simply to have been an intimidation tactic to coerce nonmembers to join; in others, it was alleged to have achieved a spread in the effective price paid to members and nonmembers. Based upon this evidence, the district court could have found that at least some of the mergers were influenced by unlawful coercion. In addition, at least one acquisition of an independent dairy involved an NFO customer which NFO lost after the acquisition. *See Midwest Milk, supra,* 510 F.Supp. at 489. On the other hand, there is substantial evidence of lawful business purposes behind formation of standby pools, related pooling practices and consolidation of marketing through mergers.

 Whether the merger and acquisition campaign was an unlawful part of the conspiracy is thus an extremely close question of fact, further complicated by the sometimes hazy line between lawful and unlawful monopolization efforts when undertaken by Capper-Volstead cooperatives. After a careful review of the record, we cannot say it was clearly erroneous for the district court to reject findings that the acquisitions, mergers and related milk pooling practices were part of an unlawful conspiracy.[41] In instances where acquisitions

---

**40.** We note that only AMPI was found to have engaged in willful suppression and destruction of documents. Our holdings as to a conspiracy between Mid-Am, CMPC and AMPI are based on the record as a whole and are entirely independent of this aspect of AMPI's conduct. Moreover, the adverse inferences which may be drawn against AMPI relate to the type of conduct which has been described herein as unlawful and not, for example, to the pooling prac-

tices and acquisitions which have not been shown to be a part of the conspiracy.

**41.** We also note that the consent decrees applicable to Mid-Am and AMPI regulate many of the milk pooling practices complained of here, as well as any further acquisitions by AMPI; and that in those proceedings, the district court determined that dissolution or divestiture of Mid-Am or AMPI holdings was not required in the public interest. *See United States v. AMPI,*

of independent dairies resulted in actual displacement of preexisting NFO sales, however, the district court, on remand, should consider whether such conduct following acquisition reflects an intent to block NFO rather than a legitimate business decision based upon price, quality or similar factors. Where post-acquisition terminations of NFO sales are found to be part of the scheme to eliminate NFO, such lost sales would form a basis for NFO's damage claim.

Our view of the milk pooling practices also prompts affirmance of the district court's finding against liability on the part of ARSPC. The principal basis for NFO's claim against ARSPC is the latter's formation and operation of standby milk pools, a practice which in principle at least is important to providing a stable supply of milk. See supra, at 1179–1180, 1180–1181. ARSPC participated in certain of the pooling practices complained of above, but because we find no liability attaches to such practices, none can attach to ARSPC's participation. NFO also contends that the existence of ARSPC's standby pools effectively reduced independent supplies making it easier for CMPC, Mid-Am and AMPI to squeeze out NFO and other independents. ARSPC's pooling, however, served legitimate business purposes and NFO failed to show that it was conspiratorially linked to the unlawful conduct of the other defendants.

The foregoing pattern of conduct establishes that Mid-Am, AMPI and CMPC conspired to gain control over milk marketing and to eliminate competition through unlawful practices. It is true that each defendant did not participate in every aspect of the conduct as a whole. CMPC, for example, exists as a federation to sell into the Chicago market and thus had no occasion to act in other markets. Mid-Am, in turn, did not sell into the Chicago market and thus had no occasion to participate in AMPI and CMPC conduct in that market. Each defendant, however, engaged in specific overt acts which on their face were in furtherance of the conspiracy. Moreover,

that these acts were in concert is unmistakeable when the record is viewed as a whole. At the outset, the three co-ops engaged in an admittedly concerted attempt to block NFO's qualification as a milk marketer. What followed in approximately the same time frame is a series of unlawful acts by each defendant aimed at eliminating independent sales of milk in general and NFO in particular, including discriminatory pricing and actual or threatened supply cutoffs, litigation and similar harassment. Some of Mid-Am's litigation threats were directed against buyers of NFO milk that had been AMPI customers, not Mid-Am customers. Mid-Am in fact gave AMPI advance notice of the suit it filed against NFO and Beatrice. AMPI and CMPC, of course, are inextricably bound together in the predatory actions undertaken in the Chicago market. The record also reveals that the defendants jointly discussed what they viewed as common "problems" posed by NFO.

Apart from the actual conduct of the defendants, the record reveals straightforward admissions of predatory motive by various AMPI officials and former officials. AMPI argues that such persons were too biased to be credible and we give AMPI the benefit of any such doubt which might support the findings of the district court. Much of the record, however, consists of deposition testimony and over 5,000 documentary exhibits. Included is a substantial paper trail of meeting minutes and contemporaneous memoranda, from Mid-Am and AMPI meetings and from independent dealers, which tend to confirm the conspiratorial and predatory character of the conduct described here as unlawful. In short, the defendants' conduct on its face demonstrates concerted, unlawful tactics and such a conclusion is confirmed, not contradicted, by examination of the underlying record.

Piece by piece, the defendants attempt to explain away the record evidence, ultimately characterizing it as "equivocal hearsay, speculation and sharply conflicting testimo-

394 F.Supp. 29 (W.D.Mo.1975); *United States v. Mid-Am*, 1977 1 Trade Cases ¶ 61,508. We affirm the district court's conclusion that, here,

NFO has not established a right to relief in the form of divestiture or dissolution.

ny." As the Supreme Court has noted, however, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clear after scrutinizing of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). Here, the totality of the record leaves no doubt that Mid-Am, CMPC and AMPI conspired to gain control over and eliminate competition in the marketing of Grade A milk, through the unlawful tactics noted above. We reverse the contrary conclusion below because we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *See also United States v. General Motors Corp.*, 384 U.S. 127, 141–146, n.16, 86 S.Ct. 1321, 1328–1331, n.16, 16 L.Ed.2d 415 (1966).

### C. Standing and Damages.

In light of its ruling as to liability, the district court did not decide any question of standing to recover damages, the appropriateness of particular damage theories, or the amount of any damages. *Midwest Milk, supra*, 510 F.Supp. at 503. Absent relevant findings in a case of this complexity, the matter must be remanded for a determination of damages. We address, however, a number of threshold legal challenges to recovery by NFO which have been raised by the defendants. Nearly all of them arise from NFO's structure as a nonprofit membership corporation which cannot make distributions to its members. As a result of this structure, when NFO began marketing milk, it formed a trust account which received payments from buyers, paid sales proceeds to producers and paid various marketing expenses.

The defendants contend that NFO lacks standing in the constitutional sense of having a sufficient "personal stake in the outcome;" that NFO is not the "real party in interest," as required by Fed.R.Civ.P. 17(a); and that NFO has not incurred any injury to its "business or property," as required under Section 4 of the Clayton Act, 15 U.S.C. § 15. *See* CMPC Br. at 2–19. In

support of these contentions, the defendants rely on a line of cases holding that an association lacks standing to sue for antitrust injury inflicted solely upon its members, and additional cases in which the antitrust plaintiff was not directly harmed, was not the direct target of the antitrust conspiracy, or similarly incurred losses which were deemed too remote or indirect. *See, e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684 (8th Cir. 1979). Some of the cases relied upon by the defendants merge standing questions with issues of how to measure damages, but the essential point is that an antitrust plaintiff cannot recover for indirect injury or for derivative harm where the plaintiff is not the target of the unlawful conduct.

We agree with the defendants that NFO cannot recover its asserted "price reduction" damages. On this theory, NFO sought to recover the differences between the price that it would have obtained but for the conspiracy and the price that it actually did obtain for sales of its milk. One threshold factual issue is causation. If NFO chose to enter a specific market at lower prices and the defendants simply lowered prices to meet such competition, there can be no recovery for such a price spread. On the other hand, if NFO can show that the defendants' unlawful conduct was a material cause in forcing NFO to lower prices, *e.g.*, if because of defendants' harassment some buyers would only consider NFO milk if it was offered at a lower price, then NFO will have established sufficient causation to pursue such damages. The measure of harm to NFO, however, because of its method of doing business, would not be the price reduction spread. NFO is a nonprofit entity which paid producers the proceeds of its sales efforts after deducting out certain marketing expenses (*e.g.*, at x cents per hundredweight). NFO's net revenues were thus tied to the volume of its marketing, not to the price it earned. The price reduction issue may be relevant to NFO's damages in that, by virtue of selling at lower prices, NFO may have lost members or, in turn, marketing volume. The measure of

such harm, however, would be the lost fees and dues from those who stopped marketing through NFO, not the price differential. Those who directly suffered price reduction damages are individual farmers, but NFO cannot recover the measure of *their* injury—it can only recover for *its* direct injury.

The defendants attempt to bootstrap from this price reduction issue to deny NFO standing to recover any damages. The contention essentially is that the NFO Trust Fund was a mere conduit for passing on monies from buyers to producers, and that in any event, the Trust must be considered entirely apart from NFO such that NFO, standing alone, is viewed as suffering no harm. *See, e.g., Buckley Towers Condominium, Inc. v. Buckwold*, 533 F.2d 934 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977).

In our view, NFO cannot be considered in isolation from the trust fund through which it transacted business; nor can NFO and its trust fund be deemed a mere conduit for monies to pass from buyers to producers. Buyers of NFO milk arranged purchases through NFO, not through individual farmers. When some of such buyers terminated purchases in the face of defendants' harassment, they sent notice of such action to NFO, not to individual farmers. Buyers thus dealt with NFO as a single entity and viewed the trust arrangement, if at all, as a bookkeeping matter. The trust fund was not a mechanical pass-through device either. NFO reblended the proceeds of its marketing efforts through the trust, to determine the actual pay price to individual producers. It also deducted certain marketing expenses from such proceeds. These determinations were made in NFO's discretion, based in part on the perceived need to maintain competitive pay prices to producers.

Moreover, NFO's marketing program was in direct competition with the defendant co-ops and NFO, as a competitor, was a direct target of the unlawful conspiracy. NFO thus was not an indirect or derivative victim of actions aimed at individual farmers. As NFO's market penetration grew, it earned net revenues in the form of membership dues and checkoff fees from those who marketed milk through NFO. Losses of such dues and fees, to the extent attributable to the defendants' unlawful conduct, represent direct injury to NFO in its "business or property." [42] It is axiomatic that a competitor directly injured from such a conspiracy is a real party in interest and has a sufficient personal stake in the outcome to have standing to assert an antitrust claim. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 123–125, 89 S.Ct. 1562, 1576–1577, 23 L.Ed.2d 129 (1969); *cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339–340, 99 S.Ct. 2326, 2331–2332, 60 L.Ed.2d 931 (1980) (holding that injury to "business or property" is not limited to commercial interests; consumer's pecuniary loss was sufficient); *see also 15 Von Kalinowski, supra*, § 115.-01–.03.

The defendants also attack NFO's right to recover membership dues and checkoff fees on the ground such damages are speculative, present impossible tracing problems, and ultimately reflect self-inflicted harm rather than damage causally linked to defendants' unlawful conduct. These arguments largely raise factual questions for the district court, but the fundamental legal guidelines are clear.

A plaintiff must, as a threshold matter, establish "the fact of injury." As the Supreme Court has construed it, a plaintiff's "burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, supra*, 395 U.S. at 114, n.9, 89 S.Ct. at 1571, n.9 (emphasis in original). Causal links also

---

**42.** The cooperative industry is unique, as defendants have stressed in other contexts, in that the ability to retain members to market through the cooperative is a key element of the organization's ability to compete. Indeed, loss of membership dues is one damage element asserted by the defendants in their claims against NFO. Under these circumstances, lost membership dues are not indirect injuries and NFO is entitled to recover such dues to the extent such losses are reasonably shown to be caused by the antitrust conspiracy.

may properly be a matter of inference from the circumstances and evidence as a whole. *Id.* at 123–125, 89 S.Ct. at 1576–1577. Here, there is no doubt that the unlawful conspiracy was the material cause, for example, of Beatrice's cutoff decision in March of 1971 and of Foremost's subsequent rejection of the same shipments. *See supra,* at 1201–1204. The extent to which rejections of NFO milk by these dairies in other periods (or by other dairies in the face of similar conduct) were also due to defendants' conspiracy is a factual question for the district court. Because the fact of injury is unmistakable on this record, the district court has rather broad latitude in assessing the amount of damages which NFO shall recover. *See Zenith Radio Corp. v. Hazeltine Research, supra,* 395 U.S. at 123, 89 S.Ct. at 1576; *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

Some of these damages are conceptually clear, such as checkoff fees from lost sales where NFO was marketing milk as a qualified marketer and received or would have received monies through its trust fund. The amount recoverable is factually more complicated where NFO sales were terminated before NFO was formally qualified in a market and had arranged payments directly between buyers and producers. Elimination of these activities was well within the scope of the unlawful conspiracy, however, and NFO has a right to recover the fees and dues that it reasonably shows it would have derived in such markets but for the effect of the unlawful conduct.

We also recognize that NFO's entry into the business of milk marketing was not conceived or managed as effectively as the efforts of the co-ops and that NFO cannot recover for losses clearly attributable to its own failures. On the other hand, NFO correctly argues that "defendants are really trying to clip NFO's wings and then escape liability on the grounds that NFO 'cannot fly.'" NFO Rep. Br. at 58. We note only that the district court must weigh these

factors, mindful that the legal standard permits recovery where defendant's unlawful conduct is "a material cause of injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Research, supra,* 395 U.S. at 114, n.9, 89 S.Ct. at 1571, n.9.

The only other question [43] relates to injunctive relief and the possible mootness effect of the Mid-Am and AMPI consent decrees. NFO is plainly entitled to an injunction against the kind of unlawful conduct identified here. The district court is, of course, free to consider the extent to which the consent decrees provide NFO with sufficient, enforceable relief.

The district court may, in its discretion, conduct such further proceedings and make such new findings as may be appropriate to ensure that the determination of damages and other relief can be made consistent with this opinion.

Affirmed in part, reversed in part and remanded.

NFO's costs on appeal shall be borne in equal shares by CMPC, Mid-Am and AMPI. The latter and ARSPC shall bear their own such costs.

---

43. The defendants do not dispute that NFO is entitled to recover the costs and reasonable legal fees related to prosecuting its affirmative antitrust claims.